[Civ. No. 32349. Second Dist., Div. Three. July 28, 1969.]

DOROTHY MAMULA, Plaintiff and Appellant, v. KEN-NETH McCULLOCH, Defendant and Appellant.

John E. Glover for Plaintiff and Appellant.

Allen, Wilson & George, Richard G. Wilson, Graham & James and Don A. Proudfoot for Defendant and Appellant.

FRAMPTON, J. pro tem.*—During the year 1962, defendant commenced construction of a convalescent hospital, to be known as the Parkcrest Convalescent Hospital, on real property owned by him in the City of Fullerton, California. The hospital neared completion about November 1962.

The real property upon which the hospital was being constructed was encumbered by a first deed of trust securing a promissory note in the approximate amount of $180,000, and by a second deed of trust securing a promissory note in the approximate amount of $41,000. The note secured by the second deed of trust contained an acceleration clause in the event the property was transferred by defendant.

Peter Mamula is a medical doctor and was married to the plaintiff during the negotiations and transactions hereinafter related.

In September or October of 1962, defendant and Dr. Mamula began negotiations for Dr. Mamula and plaintiff to purchase the hospital from defendant. Dr. Mamula and the plaintiff were represented in these negotiations by an attorney at law. The attorney, at the request of Dr. Mamula and plaintiff, organized a California corporation known as "Parkcrest Convalescent Hospital, Inc." for the purpose of facilitating the purchase of the hospital from defendant.

The negotiations reached a point on or about December 1, 1962, where there was an oral understanding that the cash-out price for the hospital was to be $300,000. The terms were to be $79,000 in cash to the defendant and the assumption by the Mamulas of the obligation to pay the two promissory notes secured by the deeds of trust.

The smaller of the two notes, by its terms, had to be paid upon the close of escrow. Thus, Dr. Mamula and plaintiff would be required to pay a total of $120,000 in cash to complete the transaction.

Commencing in October and November 1962, and continuing through January 1963, Dr. Mamula, either on behalf of himself and plaintiff or under the new corporation, purchased

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

by means of cash, open account, and on conditional sales contracts various items of equipment and supplies to make the hospital ready to receive patients.

On or about December 11, 1962, the hospital was opened for business by Dr. Mamula and plaintiff, both being present at the opening. At various times until February 1963 Dr. Mamula delivered to defendant funds totaling $52.000 as follows: $25,000 was paid on or about December 20, 1962, shortly after the Mamulas took possession of and opened the hospital, $12,000 was paid on or about January 20, 1963, and $15,000 was paid sometime in February 1963. There was no written agreement between defendant and the Mamulas for the sale and purchase of the hospital.

During December 1962, and January 1963, it became apparent that Dr. Mamula would not be able to effectively operate the hospital himself. A lease entitled "Hospital Lease," drawn by defendant, between Parkcrest Convalescent Hospital, Inc., and one Gilbert Nee, bearing date of February 1, 1963, was entered into. Pursuant to this lease, Nee took possession of the hospital on or about February 1, 1963.

During February or March 1963, Dr. Mamula received the security deposit of $18,000 from Nee under the Nee lease and deposited this amount in a joint bank account of himself and plaintiff.

During the time that Dr. Mamula and plaintiff were in possession of the hospital property they were unable to provide the necessary balance of funds to complete the purchase of the hospital, to wit: $68,000; and the hospital was operating at a loss to the Mamulas of approximately $2,400 per month.

During the entire period defendant made all payments upon the two promissory notes secured by the deeds of trust on the property. In addition, in December 1962, and January 1963, defendant executed a promissory note secured by a deed of trust on the property for approximately $15,000, the proceeds of which paid for air conditioning installed on the premises; and in various other ways conducted himself as the owner of the premises.

Plaintiff and Dr. Mamula, during the month of February 1963, discontinued all activity toward the conduct of the hospital. At a meeting between plaintiff, Dr. Mamula and defendant, a pending divorce action between plaintiff and Dr. Mamula was mentioned; there was no discussion concerning

the Parkcrest Convalescent Hospital property and its financial difficulties.

Defendant continued to hold title to the hospital property. He received from Dr. Mamula $7,000 on April 8, 1963, and $2,000 on April 10, 1963, representing rental accruals under the Nee lease for the months of April, May and June 1963.

On or about July 1, 1963, Dr. Mamula and defendant orally agreed, without the knowledge of plaintiff, to abandon and cancel the purchase and sale agreement. The terms of such oral agreement were that Dr. Mamula was to retain the security deposit payment of $18,000 received from Nee; defendant was to assume ownership of the equipment purchased by Dr. Mamula for the hospital under conditional contracts of sale, and hold Dr. Mamula and the plaintiff harmless therefrom. Defendant was to pay certain other obligations incurred by Dr. Mamula on behalf of himself and the community while operating the hospital, and defendant was to retain the deposit made by Dr. Mamula on the purchase price of the hospital in the sum of $52,000.

At all times the record title to the real property upon which the hospital was located remained in the name of defendant until on or about September 1964, when it was sold by defendant to Arthur C. Korn.

On or about April 5, 1963, plaintiff sued Dr. Mamula for divorce. Many of the obligations incurred by plaintiff and Dr. Mamula or their corporation in connection with equipping and supplying the hospital were in default. Defendant, with funds being paid by Nee under the lease and his own funds, paid some of these obligations commencing in April 1963, and continued payments thereon until a majority of them were paid in full.

On or about September 18, 1963, Dr. Mamula executed and delivered to defendant a written instrument in words as follows:

*"Release, Assignment and Sale of Interest*

For value received, receipt of which is hereby acknowledged, the undersigned hereby releases KENNETH W. McCULLOCH from any and all liability, claims or obligations arising out of their association in that certain convalescent hospital known as PARKCREST CONVALESCENT HOSPITAL, located at 2800 North Harbor Boulevard, Fullerton, California, and further assigns, sets over and sells unto said KENNETH W. McCULLOCH

any right, title and interest in said PARKCREST CONVALESCENT HOSPITAL that the undersigned may have.

Dated: *March 26, 1963.*

/S/ Peter Mamula, M.D.

Peter Mamula, M.D.''

In connection with the obtaining of the foregoing writing from Dr. Mamula, the defendant testified as follows: ''Q. Did you have any discussions with Dr. Mamula in late February or March, 1963? A. Well, from there on, from after he got that lease deposit, and he wasn't able to close, why we had a lot of discussions about any way we could go to put this thing over, and so we went every route we could think of to try to put the deal over. However, I didn't know at the time, until about June, that he was in a divorce action and he was probably getting no cooperation at all, and whether, I don't know whether he knew it before then, but if we had found something and they had discovered a divorce action pending, why you wouldn't have been able to, Community Savings wouldn't have accepted them, they would have accelerated their trust deed. So the deal couldn't have been made after, as far as him buying it and assuming the morgages [*sic*], and it would have been very difficult for him to get new financing with a divorce action pending. Q. Did you attempt to get any new financing? A. Oh yes. I attempted to get some. As I say, I didn't know that the divorce, like I say, I didn't know it was there, and I tried to get a new financing, but with the hospital open and just on the verge of either not making it or making it they wouldn't take a chance. Q. Do I understand it is your testimony that from about March until sometime in June or July you were attempting to close the same deal, the Mamula deal? A. Yes, but after June I didn't every [*sic*] think it could be possible. Q. Did you have any discussions with Dr. Mamula in June with regards to what to do with the hospital? A. Well, sometime in that period of time I said to him, 'Look, Doctor, we got to do something. We're just hanging fire here.' So I said, 'We ought to get together and give me a release so at least I can try and do something on my own because I'm not in a divorce action and I don't have any of these problems and I will try to get it re-financed, but I can't do it by hanging on the fence, whether you're going to close or whether your're [*sic*] not going to close.' Q. Were the payments with regard to the hospital being kept current at that time? A. Well, Community Savings had given me a call oh, some time in April, I believe, that they had had a report

from the General Electric Company that the payments were not being kept up on the equipment and that if they didn't get caught up why they would have to pull their equipment out. So I got a call from Community Savings, I said, 'Well, I'll try to straighten it out.' I talked to Doctor about it at that time. At a later time when I talked to him about this release, to let me take it over and I would get the payments made and then we'll try to work something out. I told him that when he did get me the release that if I could recover anything from this thing after it was all said and done why we would try to recover what we could. So that's the only reason why he gave me the release."

On March 19, 1964, plaintiff filed her action herein wherein she sought to set aside the "Release, Assignment and Sale of Interest" executed by Dr. Mamula and delivered to defendant on the grounds that it constituted a conveyance of an interest in community real property without her having joined therein, to have the hospital property declared to be the community property of plaintiff and Dr. Mamula, or in the alternative that the community be reimbursed to the extent of the fair market value of the property.

On October 28, 1965, plaintiff filed her first amended complaint wherein she alleged, in count I thereof, that on or about December 1, 1962, defendant and Dr. Mamula had entered into a written contract for the sale and purchase of the hospital; Dr. Mamula had paid defendant $68,250 in connection with such written agreement from the community funds of plaintiff and Dr. Mamula; Dr. Mamula had transferred all his right, title and interest in the hospital to defendant by the execution and delivery of the written "Release, Assignment and Sale of Interest," hereinabove referred to, and thus deprived her of her community interest in said real property; at the time of the filing of her original complaint, she and Dr. Mamula were husband and wife; at that time there was a divorce action pending between them; subsequent to the filing of the original complaint, she and Dr. Mamula entered into a written property settlement agreement in June 1964, which agreement, among other things, provided as follows: "D. It is agreed that in the event that the Wife effects any recovery by way of settlement, judgment, or otherwise, for and on behalf of the community estate in the matter of Dorothy Mamula vs. Peter Mamula, Kenneth McCulloch, et al, that she will hold said recovery as a trustee in which the said husband shall have a one-half interest and further that she will pay to him

upon receipt thereof one-half of said recovery less a proportionate share of the court costs and reasonable attorney's fees.'' On July 16, 1965, plaintiff and Dr. Mamula were divorced by final decree of divorce entered in said action; pursuant to the property settlement agreement, plaintiff agreed to and did dismiss Dr. Mamula as a party defendant in the within action. Plaintiff sought to void the assignment and to have the real property or the value thereof returned to the community.

The second count of plaintiff's first amended complaint alleged that the furniture, fixtures and equipment installed in the hospital were purchased and partially paid for out of community funds; that the assignment heretofore referred to of the community's interest in said personalty was made without consideration. The prayer sought the return of such personal property or the value thereof, less offsets to which defendant may be entitled.

The trial court made findings of fact and conclusions of law and rendered judgment based thereon in favor of plaintiff and against defendant on the first count of the amended complaint in the sum of $34,000, representing the difference between the sum of $52,000 paid by the community on the oral contract of purchase of December 1962, and the sum of $18,000 returned to the community as the result of the Nee lease. Judgment was rendered against the plaintiff on the second count of the amended complaint.

The conclusions of law recite the following:

''1. That the plaintiff is not entitled to recover under the theory of unjust enrichment nor under Civil Code Section 172 in that valuable consideration was paid by Kenneth McCulloch pursuant to the oral agreement of July 1, 1963.

''2. The deposit made by Peter Mamula to the defendant and the taking of possession constitutes an equitable interest in the subject real property and thus converts the deposit into realty.

''3. The retention of the balance of the deposit, to wit: $34,000, pursuant to the oral contract and the release delivered on or about September 18, 1963, constitutes a conveyance of realty under Section 172(a), which requires the signature of plaintiff.

''4. The signature of the plaintiff having not been obtained in the conveyance, the plaintiff is entitled to recover not the real property which was never conveyed to the community, but the deposit as the community's equitable interest in said realty.

"5. Plaintiff is entitled to recover all of the deposit, notwithstanding the husband's right to receive one-half thereof by virtue of the Property Settlement Agreement, in that the recovery under Section 172(a) is a recovery of the entire interest of the community unless death occurs or divorce has become final prior to the action of the wife to recovery [*sic*] said real property.''

The appeal is from the judgment. Plaintiff has cross-appealed from the judgment.

### Contentions on Appeal

Defendant contends that (1) the doctrine of equitable conversion is inapplicable because the contract of sale was never subject to specific performance; (2) any real property interest obtained by the Mamula community was divested by operation of law prior to the oral release made in July 1963, and (3) if plaintiff is entitled to recover, the amount of damages awarded is erroneous.

Plaintiff in her cross-appeal urges that (1) the court erred in limiting the recovery on the first count of her amended complaint in the sum of $34,000; (2) the court erred in denying judgment on the second count of her amended complaint, she being entitled to judgment under the provisions of section 172, Civil Code in an amount equal to the benefits defendant McCulloch received from Dr. Mamula by way of personal property; (3) the court erred in failing to make findings upon the issue as to whether or not plaintiff was entitled to recover on the theory of unjust enrichment, and (4) the court erred in failing to award interest and costs to plaintiff.

### Equitable Conversion

The doctrine of equitable conversion is a mere fiction, which rests on the maxim that equity regards as done that which should have been done. (18 Cal.Jur.2d, Equitable Conversion, § 2, pp. 108-109; 18 C.J.S., Conversion, § 2, p. 45.) When a binding executory contract for the sale of real property is entered into, an equitable conversion of the property, on the theory that a court of equity will regard as done that which ought to have been done, occurs under which the purchaser is deemed to be the equitable owner of the property and the seller the owner of the purchase money, with an equitable lien on the property for the balance of the unpaid purchase price. The vendor is regarded as holding the legal title in trust for the purchaser; the purchaser, in turn,

is considered the trustee of the purchase money for the benefit of the vendor. ■ The equitable conversion thus deemed to have been effected may or may not be absolute, depending on whether the terms of the contract are subsequently complied with. If there is no default in this regard, and if the purchaser performs all conditions precedent that entitle him under the agreement to a conveyance of the property on a given day, he will on that day be considered to be the owner of the property, and the vendor will be regarded as the owner of the purchase money. ■ The fact that the vendor may refuse to perform his part of the agreement and refrain from making the conveyance to which the purchaser is entitled on compliance with the provisions of the contract will not affect the status of the parties or their rights in the property, for when a purchaser has performed or offered to perform his covenants, at the time provided in the contract for the conveyance of the property, he will be treated in equity from that time on as the owner of the property, and the vendor will be regarded as merely holding the legal title thereto in trust for him. (*Estate of Dwyer,* 159 Cal. 664, 675 [115 P. 242]; 18 Cal.Jur.2d, Equitable Conversion, § 13, pp. 121-123; 18 C.J.S., Conversion, § 9, pp. 48,49.) Where taxes had been levied and collected on real property on the theory that the plaintiff, who had paid the taxes under protest and who had brought suit to recover such payments, held the equitable title to the realty, the court in sustaining the judgment in favor of the plaintiff held that ''For the doctrine of equitable conversion to apply in measure of tax liability, there must be 'a contract for the sale and purchase of the land which is specifically enforceable at the time the rights of the parties are fixed.' (McClintock on Equity, § 102, p. 182; see also *Estate of Dwyer, supra,* 159 Cal. 664, 675.)'' (*Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157, 168 [272 P.2d 16].) There is nothing in the decision of *Estate of Reid,* 26 Cal.App.2d 362 [79 P.2d 451], as applied to the facts of that case, cited and relied on by plaintiff, which is contrary to the rule above stated.

■ In the case at bench the trial court found that the agreement for the sale and purchase of the real property was an oral agreement entered into on or about December 1, 1962, the terms of which were ''A purchase price of $300,000 cash to the unpaid balance of a Note Secured by First Trust Deed in the approximate amount of $180,000 plus a Note Secured by Second Trust Deed with an unpaid balance of approximately $41,000,'' the latter note containing an acceleration

clause requiring payment in full in the event of sale of the property. Nothing is provided in this agreement as to the time limit within which the prospective purchaser would be required to obtain the necessary cash to conclude the transaction. The contract, relating to the sale and purchase of realty, being oral, violated the statute of frauds (Code Civ. Proc., § 1971), and specific performance thereof could not be decreed against defendant unless there was such performance under the oral contract on the part of plaintiff and Dr. Mamula as to create an estoppel against defendant to raise the statute of frauds to defeat plaintiff's claim. Estoppel was not pleaded or raised at the trial level. (See *Harper* v. *Goldschmidt*, 156 Cal. 245, 252 [104 P. 451, 134 Am.St.Rep. 124, 28 L.R.A. N.S. 689]; 18 Cal.Jur.2d, Estoppel, § 15, pp. 425-426.) Furthermore, the Mamulas were in default under the oral contract of purchase and had failed to perform or offer to perform the conditions precedent thereunder which, upon performance, would have entitled them to a conveyance of the property. In view of this default, the Mamulas could not have compelled specific performance of the oral contract as against defendant. On or about July 1, 1963, and on or about September 18, 1963, when the oral agreement of abandonment and the written release, respectively, were entered into, as found by the court, the Mamulas had not performed or offered to perform the conditions precedent contained in the oral contract of purchase which, if performed, would have entitled them to a conveyance. The transaction in this state left nothing upon which the doctrine of equitable conversion could operate. A court of equity under these facts certainly would not and could not order a conveyance of a portion of the real property equal in value to the amount paid under the oral contract. We are of the opinion that the trial court erred in applying the doctrine of equitable conversion here, and that the plaintiff and Dr. Mamula, because of their failure to perform or offer to perform the conditions precedent on their part to be performed under the oral contract of purchase, did not acquire an equitable title in the real property of the defendant. In these circumstances neither the oral agreement of abandonment nor the written release entered into between Dr. Mamula and the defendant constituted a conveyance of real property in violation of the plaintiff's rights in the community real property protected by the provisions of section 172a, Civil Code. This conclusion makes it unnecessary to comment on the other issues raised by defendant.

■ Plaintiff and cross-appellant urges that the trial court erred in denying her recovery on the second count of her amended complaint wherein she claimed that Dr. Mamula disposed of the community personal property without consideration in violation of the provisions of section 172, Civil Code. This claim is based upon the transfer by Dr. Mamula to defendant of the personal property purchased by the Mamulas on conditional contracts of sale, which property was installed and used in the hospital.

The trial court found that the oral agreement of abandonment and cancellation of the purchase and sale agreement entered into between Dr. Mamula and defendant on or about July 1, 1963, provided, among other things, that defendant was to assume ownership of the equipment purchased by Dr. Mamula under conditional sales contracts and was to hold Dr. Mamula and the plaintiff harmless therefrom; that in addition, defendant was to pay certain other obligations incurred by Dr. Mamula on behalf of himself and the community while he was operating the hospital; that the agreement was a validly executed contract for a valuable consideration, and that defendant did pay certain obligations of Dr. Mamula and the community incurred while Dr. Mamula was operating the hospital. While the record shows that Dr. Mamula did pay substantial sums on the conditional sales contracts for the purchase of equipment and fixtures for the hospital, it also discloses that defendant assumed the obligations under these contracts and made payments thereon after the Mamulas had defaulted in connection therewith. Plaintiff offered no evidence as to the fair market value of the equipment and fixtures involved as of the time of the transfer. (See *Honey* v. *Henry's Franchise Leasing Corp.*, 64 Cal.2d 801, 805 [52 Cal. Rptr. 18, 415 P.2d 833].) It is reasonable to assume, however, that the personal property involved had depreciated in value from the time of its purchase to the time that it was transferred to defendant. There was substantial evidence to support the trial court's finding that the oral agreement of transfer of July 1963 was executed for a valuable consideration.

■ Plaintiff urges that the court erred in failing to make findings upon the issue as to whether or not she was entitled to recover on the theory of unjust enrichment.

The trial court found that the oral agreement of July 1, 1963, was for the abandonment and cancellation of the oral purchase and sale agreement involving the hospital property and that it was supported by a valuable consideration. As

heretofore pointed out, such oral agreement made a complete disposition of the rights of the respective parties under the oral purchase and sale agreement. Such rights having been completely settled by the oral contract of abandonment, there was no basis for the application of the rule of unjust enrichment.

■ "To 'cancel' a contract means to abrogate so much of it as remains unperformed. It differs from 'recission,' which means to restore the parties to their former position. The one refers to the state of things at the time of the cancellation; the other to the state of things existing when the contract was made." (*Young* v. *Flickinger,* 75 Cal.App. 171, 174 [242 P. 516].) ■ Here, the oral agreement of cancellation did away with the oral agreement of purchase and sale upon the terms and conditions and with the consequences mentioned in the agreement of cancellation. (*Winton* v. *Spring,* 18 Cal. 452, 455; *Law Credit Co.* v. *Tibbitts,* 160 Cal. 626, 629-630 [117 P. 772]; *Evans* v. *Rancho Royale Hotel Co.,* 114 Cal.App.2d 503, 508-509 [250 P.2d 283]; *Q.S.W. Corp.* v. *Malick,* 257 Cal.App. 2d 277, 281 [64 Cal.Rptr. 722].) In this state of the record, a specific finding on whether plaintiff was or was not entitled to recover on the theory of unjust enrichment would be redundant.

Lastly, plaintiff urges that the trial court erred in failing to award interest and costs to plaintiff. In view of the fact that the judgment must be reversed, it is unnecessary to discuss the matter of interest and costs at the trial level.

The judgment is reversed. Each side to bear his or her costs on appeal.

Ford, P. J., and Schweitzer, J., concurred.

A petition for a rehearing was denied August 19, 1969, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied September 24, 1969.