**Donald R. MacPHERSON, Plaintiff,**

**v.**

**UNITED STATES of America,
Defendant.**

**No. CV 84–2678–KN (Px).**

United States District Court,
C.D. California.

Feb. 21, 1985.

Hillel Chodos, Justin L. Goldner, Trachman & Goldner, Beverly Hills, Cal., for plaintiff.

Mason C. Lewis, Asst. U.S. Atty., Los Angeles, Cal., Daniel R. Ross, Janice Brown Teague, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

ORDER

KENYON, District Judge.

The Court, having heard argument from counsel on December 10, 1984, and having considered the papers filed with respect to Plaintiff's Motion for Summary Judgment, including the briefs and exhibits filed after the hearing at the Court's request, hereby makes the following findings and order:

Plaintiff MacPherson, as a general partner of National Petroleum Associates ("NPA"), seeks a refund of taxes paid under the Windfall Profit Tax on Domestic Crude Oil. I.R.C. §§ 4986–4998. The claim for refund concerns oil removed from certain properties in 1980. During 1980, the properties in question were subject to litigation. This litigation arose from an agreement entered into on or about October 12, 1973, whereby MacPherson, as the nominee for NPA, agreed to purchase the oil properties in question from James C. Thomas. Thomas apparently refused to sell the properties after the execution of this agreement. Thus, in April 1974, MacPherson and NPA brought an action for specific performance against Thomas and others. *See* Case No. 127414, Superior Court of the State of California for the County of Kern. In the course of this litigation, the parties entered into a stipulation on September 22, 1978. Said stipulation placed the disputed properties under the joint control of the litigants, with the operation and income to be supervised by the court. Pursuant to the stipulation, Frank Mondary was appointed as a neutral third-party to operate the properties on behalf of the state court. Judgment was entered in favor of MacPherson and NPA on February 11, 1982. The judgment provided that plaintiffs were entitled to the properties and the assets of the joint operation if they tendered $790,017.17 plus interest within 30 days of notice of the entry of judgment. Plaintiffs did tender the requi-

site amount within the 30-day period and assumed ownership of the properties.

Pursuant to § 4995(a)(1), the first purchaser of the crude oil removed in 1980 from the disputed properties, namely Witco Chemical Corporation (*see* Declaration of Joseph Russo, Exhibit B–1 to Supplement to Plaintiff's Reply to Defendant's Supplemental Brief), withheld the taxes for which the producer of the oil is held responsible under § 4986(b). It is clear, however, that the income obtained from Witco's purchase of the crude oil was held in *custodia legis* under the September 22, 1978 stipulation. *See* Referee's Findings of Fact and Conclusions of Law, Exhibit C to Declaration of Janice Brown Teague, ¶¶ 7, 57. Thus, MacPherson contends that since he did not have access to the income derived from the properties in 1980, his income from the properties during that year should have been $0. Believing himself to have been a producer of the crude oil in 1980, MacPherson asserts that the proper calculation of the net income limitation provided in § 4988 would necessitate a finding that he is not liable for any windfall profits tax during that year.

This claim presents three issues for resolution. All three can be resolved on this motion for summary judgment. First, did MacPherson earn any income from the properties in 1980? Second, assuming the first question is answered in the negative, is MacPherson a producer under the terms of the code and was any windfall profits tax paid on his behalf? Third, assuming the second question is answered in the positive, is MacPherson entitled to a refund of 34% of the taxes paid on behalf of NPA?

### I. Net Income

Section 4986 imposes an excise tax "on the windfall profit from taxable crude oil removed from the premises during each taxable period." Windfall profit is determined pursuant to the formula prescribed in § 4988(a), but in no event shall the windfall profit "exceed 90 percent of the net income attributable to [each] barrel [of crude oil]." § 4988(b)(1). Crucial to the determination of the net income attributa-

ble to each barrel is the "taxable income from the property for the taxable year attributable to taxable crude oil." § 4988(b)(2)(A). This taxable income shall be determined under section 613(a). § 4988(b)(3)(A). The first question presented in this case is whether MacPherson had any taxable income under § 613(a).

In *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932), the ownership of a section of oil land was in dispute. In 1916, a receiver was appointed to operate the property and to retain the net income. The company eventually received this net income from the receiver in 1917. The Court found that the income was not taxable in 1916 "because at no time during the year was there a right in the company to demand that the receiver pay over the money." *Id.* at 423, 52 S.Ct. at 615. Instead, the funds were taxable as income in 1917 "when [the company] first became entitled to them and when it actually received them." *Id.* at 424, 52 S.Ct. at 615. Similar reasoning regarding impounded or escrowed funds was applied to the determination of allowable deductions from taxable income for purposes of the oil depletion allowance. In *Crews v. Commissioner*, 30 B.T.A. 615 (1934), *aff'd*, 89 F.2d 412 (10th Cir.1937), the Board of Tax Appeals found that "[s]ince there was no liability for tax until the date of the settlement which released the impounded funds, it follows, of course, that all deductions in connection with the taxability of the income involved are allowable in the year of the release of the impounded funds." *Id.* at 618. This ruling was made pursuant to § 114(b)(3) of the Revenue Act of 1928, which is the predecessor provision to § 613.

█ These decisions compel the conclusion that MacPherson did not have an accession to wealth from the oil properties in 1980 and thus did not have taxable income in that year for purposes of assessing a windfall profits tax. As was the situation in *North American Oil* and *Crews*, MacPherson and the other partners of NPA did not have a right to the income derived from

the properties in 1980. Only in 1982, when the state court rendered its judgment and the purchase money was tendered, did the partners of NPA first become entitled to the money and actually received such money. Moreover, the code provides that taxable income for purposes of the windfall profits tax shall be determined under § 613(a), the successor provision to the one relied upon in *Crews*. Thus, this Court finds that under § 613(a), and therefore under the windfall profits tax pursuant to § 4988(b)(3)(A), a taxpayer has received no taxable income if the funds were being held in *custodia legis*.

Congressional intent does not appear to be to the contrary. Defendant's only evidence of such contrary intent is § 4996(g), which provides in pertinent part that no exemptions from the windfall profits tax shall be allowed "except to the extent provided in this chapter...." This Court finds that, through reference to § 613(a) for purposes of defining taxable income, the chapter incorporates the principles articulated in *North American Oil* and *Crews* with respect to impounded or escrowed funds. Without a stronger showing that Congress did not intend to follow these principles, this Court cannot find that the net income limitation provided in § 4988 requires the funds in dispute to be taxable in 1980.

Thus far, this ruling merely indicates that MacPherson was not obligated to pay any windfall profits tax in 1980. The question still remains whether such a tax was paid on his behalf.

II. *"Producer"*

As stated above, the windfall profit tax is to be paid by the "producer of the crude oil." § 4986(b). The producer of the oil is "the holder of the economic interest with respect to the crude oil." § 4996(a)(1)(A). Thus, this Court must focus upon the economic interests in the oil removed from the disputed properties in 1980 since "Congress, by defining 'producers' as the holders of the economic interest in the oil, has, in effect, made 'economic interest' the touchstone of the [windfall profits tax]."

*Lewis v. Reagan*, 516 F.Supp. 548, 552 (D.D.C.1981).

Section 51.4996–1(b)(1) of the Excise Tax Regulations Under The Crude Oil Windfall Profit Tax Act of 1980, 26 C.F.R. § 51.-4996–1(b)(1), states in pertinent part: "[T]he term 'economic interest' has the same meaning as it has for purposes of Subtitle A of the Code." Subtitle A defines "economic interest" as follows:

> An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital ... A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production.

Treas.Reg. § 1.611–1(b)(1). This term "economic interest" has been analyzed in great detail by the Supreme Court and lower federal courts. Such analysis has been in the context of the depletion allowance provided in § 611, in which the allowance was designed to restore the taxpayer's capital investment in the oil as the oil is depleted. *Anderson v. Helvering*, 310 U.S. 404, 407–08, 60 S.Ct. 952, 953–54, 84 L.Ed. 1277 (1940). The Supreme Court further explained:

> It follows from this theory that only a taxpayer with an economic interest in the asset, here the oil, is entitled to the depletion. By this is meant only that under his contract he must look to the oil in place as the source of the return of his capital investment. The technical title to the oil in place is not important.... The test of the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted.

*Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90

L.Ed. 343 (1946) (citations omitted). *See also United States v. Thomas,* 329 F.2d 119, 129–30 (9th Cir.1964).

■ The question thus presented is whether MacPherson had a sufficient interest in the oil in place in 1980. Given the litigation in state court following Thomas' refusal to close the deal for the oil properties, it is clear that MacPherson and NPA did not hold legal title to the properties. As noted above, however, the Supreme Court in *Kirby Petroleum* made clear that technical title to the property is not necessary to hold the requisite economic interest. In this case, although MacPherson did not hold legal title to the property in 1980, he did hold equitable title to the property under the doctrine of equitable conversion. Upon the signing of the binding executory contract for the sale of the oil properties, an equitable conversion occurred under which MacPherson, as the nominee of NPA, is deemed to be the equitable owner of the properties and Thomas the equitable owner of the purchase money. *See In re Dwyer's Estate,* 159 Cal. 664, 115 P. 242 (1911); *Mamula v. McCulloch,* 275 Cal. App.2d 184, 193, 79 Cal.Rptr. 571 (1969). This equitable ownership exists regardless of whether the conversion is absolute, that is, whether the terms of the contract are subsequently complied with. *Id.* In this instance, MacPherson and NPA held equitable title to the properties in 1980, and such title was made absolute within 30 days after the state court's entry of judgment in February 1982. The issue presented is whether this equitable interest in the properties provides the requisite economic interest for MacPherson to be held to be a "producer" of the oil.

In *Mamula v. McCulloch, supra,* the court stated:

The fact that the vendor may refuse to perform his part of the agreement and refrain from making the conveyance to which the purchaser is entitled on compli-ance with the provisions of the contract will not affect the status of the parties or their rights in the property, for when a purchaser has performed or offered to perform his covenants, at the time provided in the contract for the conveyance of the property, he will be treated in equity from that time on as the owner of the property, and the vendor will be regarded as merely holding the legal title thereto in trust for him.

275 Cal.App.2d at 194, 79 Cal.Rptr. 571. The state court's judgment granting plaintiffs the specific performance requested makes this statement in *Mamula* fully applicable to the case at bar. Thus, in 1980, Thomas (the vendor) was merely holding the legal title in trust for MacPherson (the purchaser). The Supreme Court has indicated that when a taxpayer holds an equitable interest in the property through the existence of a trust, such an interest would suffice for purposes of creating an economic interest in the mineral in place. In *Helvering v. O'Donnell,* 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903 (1938), the taxpayer sold stock in a company which owned certain oil and gas properties and, in return, the taxpayer received one-third of the net profits derived from the development and operation of said properties. In deciding that this agreement gave the taxpayer an economic advantage but not an economic interest in the properties, the Court also stated: "No trust was declared by which respondent could claim an equitable interest in the *res.*" *Id.* at 372, 58 S.Ct. at 620. This statement clearly implies that if an equitable interest in the oil properties was created through a trust, the requisite economic interest would exist. This is the situation presented here. The doctrine of equitable conversion creates a trust, whereby the vendor (Thomas) serves as trustee for the equitable owner (MacPherson).[1] Additionally, such an interpretation of "ec-

---

1. Although under the doctrine of equitable conversion Thomas was serving as a trustee, he would not be responsible for the payment of the 1980 windfall profits tax under § 641. Since the income from the properties was being held in *custodia legis, North American Oil, supra,* and *Crews, supra,* apply with equal force to Thomas as trustee as they do to MacPherson as a partner of NPA.

onomic interest" is consistent with the prior development of that term. As the oil was extracted from the properties in question in 1980, it is clear that the value of MacPherson's equitable interest was diminished. Thus, this Court finds that Mac-Pherson, as the nominee of NPA, was the holder of an economic interest in the properties and was thereby a "producer" of the oil removed from the premises in 1980. §§ 4986, 4996.

With respect to defendant's contention that the joint operation created through the September 22, 1978 stipulation constituted a trust which is taxable under § 641, the Court finds that neither Frank Mondary nor the joint operation as a whole had the requisite fiduciary responsibilities in connection with MacPherson's economic interest. The Internal Revenue Code clearly distinguishes between a "producer" who holds the economic interest in the property and an "operator" who assumes primary responsibility for management and operation of the crude oil production. Compare § 4996(a)(1)(A) with § 4996(a)(2)(A). Whereas the producer assumes the windfall profits tax liability, see § 4986(b), the operator may be substituted for the first purchaser and pays the tax on behalf of the producer. See § 4995(a)(7). The stipulation of September 22, 1978 plainly created a joint operation that was to manage and operate the properties, not hold the economic interest in trust. Paragraph three of the February 11, 1982 Referee's Findings of Fact and Conclusions of Law states: "When the stipulation of September 22, 1978, and the order of the Court thereon were signed and filed, the *operation* of all of the oil-producing leases which are the subject of this controversy was turned over to the joint control of the parties under supervision of the undersigned." (Emphasis added.) Paragraph seven of these findings indicates that while "all expenses pertaining to the operation of the subject properties have been paid or are owed by the joint operation," the "assets and amounts remaining after payment of the expenses are currently retained in *custodia legis....*" Furthermore, as explained in the Declaration of Donald R. MacPherson, Jr., Mondary was solely responsible for operational decisions, and those decisions are subject to review by both litigants. It is evident that the joint operation was designed and functioned as an operator under § 4996(a)(2)(A), and was not a holder, through trust or otherwise, of any economic interest in the oil. To the extent that a third-party did assume certain responsibilities over the income and economic interest, that third-party would be the Superior Court. The Superior Court's role in holding the disputed funds, however, did not create an obligation to file a return with respect to the 1980 windfall profits tax. *See, e.g., Lee McRitchie,* 27 T.C. 65 (1956).

Finally, defendant asserts that plaintiff has not sufficiently demonstrated that he was the producer on behalf of whom the 1980 windfall profits tax was paid. The Court disagrees. First, MacPherson attached as Exhibit A–1 to his complaint the refund claim he filed with the Internal Revenue Service. This refund claim was signed under penalty of perjury and states: "Data showing the correct windfall profits tax is contained in the accompanying attachments." Included in the accompanying attachments are the Forms 6248, the accuracy of which the defendant challenges. These forms indicate that Witco (the first purchaser) withheld the taxes on behalf of Thomas Oil. Exhibit C to Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Moving Papers"). In turn, Thomas Oil withheld the taxes on behalf of NPA. Exhibit B to Moving Papers. Finally, NPA withheld a portion of the taxes on behalf of MacPherson. Exhibit A to Moving Papers. The Declaration of Joseph Russo makes clear that Witco did withhold the stated tax and made payment to the Internal Revenue Service. Since this Court has determined that MacPherson is a holder of an economic interest in the oil, and since these Forms 6248 and claim for refund have been unchallenged by contrary evidence, the Court finds that certain windfall profits taxes were paid on behalf of MacPherson.

III. *Amount of Refund*

Section 4996(a)(1)(B)(i)(II) provides that each partner shall be treated as a producer of the crude oil. Section 4996(a)(1)(B)(ii) further provides that the oil shall be allocated among the partners "on the basis of a person's proportionate share of the income of the partnership." *See also* 26 C.F.R. § 51.4996–1(b)(2). It is clear that the focus of the allocation is on the income received by the partnership. Under *North American Oil* and *Crews*, NPA did not receive any income from the oil properties until 1982. Thus, the relevant time period for determining the proportionate share of an NPA partner's income would be 1982. At that time, it is undisputed that MacPherson would be entitled to 34% of the income. Consequently, MacPherson is entitled to 34% of the refund, or $196,050.00 plus interest thereon.

Since no genuine issues of material fact remain, the Court finds as a matter of law that plaintiff is entitled to the refund sought. The Court requests plaintiff to prepare proposed findings of fact and conclusions of law consistent with this order by March 6, 1985.