DAVID SARTORI, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JAMES SARTORI AND KATHLEEN SARTORI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 433-74, 434-74.    Filed June 30, 1976.

*Leo M. Stepanian* and *Robert T. Schwer,* for the petitioners.
*Robert J. Percy,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the taxable year 1970, as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 433-74 | David Sartori _____ | $40,263.42 |
| 434-74 | James Sartori and Kathleen Sartori _____ | 40,404.24 |

As a result of certain concessions made by petitioners, the only issue remaining for decision in these consolidated cases is whether certain property purchased and placed in service in 1970 by Willowbrook Mining Co., petitioners' wholly owned subchapter S corporation, qualifies as pretermination property under section 49(b), I.R.C. 1954,[1] such that petitioners are entitled to the investment credit claimed by them in 1970 in respect of that property. Qualification under section 49(b) in turn depends on whether such property was acquired pursuant to a contract which, as of April 18, 1969, and at all times thereafter, was binding upon Willowbrook.

### FINDINGS OF FACT

Certain facts have been stipulated by the parties and are accordingly so found.

David Sartori, petitioner in docket No. 433-74, resided in Slippery Rock, Pa., at the time his petition herein was filed. His Federal income tax return for the taxable year 1970 was filed with the Internal Revenue Service Center at Philadelphia, Pa.

James and Kathleen Sartori, petitioners in docket No. 434-74, resided in Grove City, Pa., on the date of the filing of their petition herein. Their joint Federal income tax return for the taxable year 1970 was filed with the Internal Revenue Service Center at Philadelphia, Pa.

James Sartori and David Sartori (hereinafter respectively referred to as James and David) are brothers. During 1970, the year in issue, each owned one-half of the capital stock of Willowbrook Mining Co. (hereinafter Willowbrook), a corporation organized under the laws of Pennsylvania in 1958 and which had its principal office in Slippery Rock, Pa. Willowbrook was formed to engage in the open-pit mining of bituminous coal (commonly known as strip mining) in the western Pennsylvania area, which operation was originally started in 1955 by James' and David's father in his individual capacity. In the taxable year 1965, Willowbrook filed an election under section 1372 to be treated as a small business corporation for purposes of subchapter S (sec. 1371 et seq.). The required

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years involved herein, unless otherwise specified.

consents of Willowbrook's shareholders were timely filed. Willowbrook was a subchapter S corporation throughout 1970.

James served as secretary of Willowbrook from its incorporation until sometime in 1972 when he became president. In both capacities, James had primary responsibility for conducting the business of Willowbrook.

In October 1968 James began negotiations with Marion Power Shovel Co. (hereinafter referred to as Marion), a manufacturer of mining equipment located in Marion, Ohio, for the purchase by Willowbrook of a dragline for use in its mining operations. A dragline is a type of earth excavator that removes the deposit of material known as overburden which lies above the coal seam. The standard model dragline is powered by electricity supplied by a cable running along the ground to the machine. James, however, was interested in a dragline designed to have its own power source on board and indicated his interest in a dragline with a diesel engine mounted on it, not only to generate the requisite electricity but also to provide for a safer and more efficient operation on the particularly soft overburden covering the area Willowbrook intended to mine. James also gave Marion Willowbrook's specifications as to size, dumping radius, mobility, and ground-bearing pressure.

Marion did not have a dragline available which satisfied all of Willowbrook's specifications. Marion had not previously built a diesel-driven dragline and indicated to James that certain foreseeable engineering problems might render his diesel concept unworkable. Marion agreed to make some preliminary studies as to the feasibility of using a diesel engine in order to discuss further what model dragline would best accommodate Willowbrook's requirements. Subsequent to this initial meeting, several dragline models and modifications thereto were considered by Marion and Willowbrook. On February 18, 1969, James went to Marion's offices for the purpose of ascertaining whether Marion would be able to build a dragline that satisfied Willowbrook's specifications. The sales and engineering personnel present for Marion indicated that Marion could build a dragline with the required modifications, which statement James took as an expression that Marion would do so. James was asked for and did verbally give Willowbrook's commitment to purchase such a dragline. No specific purchase price was mentioned but a

general agreement was reached as to the component elements of the total cost to Willowbrook.

After this meeting of February 18, 1969, Marion proceeded with the engineering work necessary to build a dragline for Willowbrook. In May 1969 Marion proposed to provide Willowbrook with a modified type 195M dragline. This proposal did not satisfy Willowbrook's specifications and was rejected by James. Subsequently, in December 1969 Marion proposed to supply a modified type 7400 dragline, which machine did meet Willowbrook's requirements.

On January 10, 1970, the board of directors of Willowbrook held its annual meeting. The minutes thereof contain the following in respect of the dragline to be purchased from Marion:

A report was given by James Sartori on the purchase of the Model 7400 Marion Dragline. James Sartori was given authorization to formally sign the contract with Marion Power Shovel Company, Inc. on said machine and to start progress payments of $30,000 per month starting February, 1970, for a period of seven months totaling $210,000 on said machine. It was also reported that shipment was to commence approximately September 1, 1970. * * *

Upon motions duly made and seconded, the above purchase, progress payments, * * * were unanimously carried. Motions were approved as follows: James Sartori, yes; David Sartori, yes; and Eugene Sartori, yes.

Thereafter, an order contract was executed by Willowbrook and Marion which in pertinent part provided:

ORDER CONTRACT

THIS AGREEMENT made and entered into at Slippery Rock, Pennsylvania, this 18th day of February, 1970 by and between MARION POWER SHOVEL COMPANY, INC., (hereinafter referred to as "SELLER") of Marion, Ohio, and Willowbrook Mining Company * * * (hereinafter referred to as BUYER) a Corporation of Slippery Rock, Pennsylvania with principal place of business located at 362 E. Water St., Slippery Rock, Pennsylvania, in the county of Butler in said state, WITNESSETH:

1. SELLER agrees to deliver to BUYER, F.O.B. point of shipment, when ready to ship, which will be on or about Sept.—Oct., 1970, unless prevented by Acts of God, war, preparation for war, the requirement, urgency or intervention of Naval or Military authorities or other agencies of Government or occasioned by contractual arrangements therewith, blockades, sabotage, vandalism, insurrections, landslides, floods, earthquakes, collisions and fires, shortages of material and equipment, strikes, lockouts or other industrial disturbances, failure or delay of other manufacturers in furnishing parts for this order which SELLER is required to purchase from other manufacturers, delays of subcontractors, accidents and delays of carriers and other unforeseen contingencies or unavoidable occurrences, and any cause beyond the control of SELLER, the following property (which, together with any replacements

and/or additions, is hereinafter referred to as "equipment") which BUYER agrees to purchase, all upon the terms and conditions hereinafter set forth: One (1) Marion Type 7400 Electric Walking Dragline, with 185 foot boom, (Inserts to be one 15 foot and one 10 foot), cab heater, automatic lubrication upper frame and house rollers, cable winch, complete paint job, mercury vapor lights on boom. Customer very much prefers G.E. electrical equipment, but will accept Westinghouse if delivery is affected. Either Bethlehem Steel Company or Roebling wire rope—do not use U.S. Steel wire rope. Ballast, power feeder cable, and bucket NOT included. All this in accordance with Specification 1153.

    \* \* \*

5. BUYER agrees to pay all freight and transportation charges on said equipment, special loading charges, if any, where shipment is being made other than by railroad, and, on or before thirty (30) days from delivery date as hereinafter defined to pay SELLER for said equipment, subject to the provisions of paragraph 7 hereafter, the sum of Seven Hundred Eighty-four Thousand Dollars ——————————— Dollars ($784,000.00) in cash, subject, however, to a cash discount of none % of the cash payment due, if payment is made within —— days after said delivery date.

Thirty Thousand Dollars with this order, and thirty thousand dollars for the next six (6) months, balance of five hundred and seventy-four thousand dollars as follows: $374,000 thirty days from final shipment; $200,000 for Manitowoc 4600, S/N 46111, to be traded in.

    \* \* \*

13. BUYER authorizes SELLER to insert in this Agreement SELLER'S sales order number, sales factory number, \* \* \* and to insert herein anything required to complete this Agreement consistent with the offer of BUYER to purchase said equipment hereinbefore described, subject to acceptance thereto by SELLER at its home office.

    \* \* \*

17. This Agreement, when accepted as hereinafter provided, shall be binding upon the parties hereto, their executors, administrators, successors and assigns, and shall inure to the benefit thereof.

18. This Agreement shall be construed in accordance with the laws of the State of Ohio, it being understood, however, that if any provision is prohibited by or under the laws of any forum in which this Agreement may be used or to which it may be made applicable, said provision shall be, as to said forum, ineffective to the extent of such prohibition without invalidating thereby any of the remaining provisions of the Agreement.

19. It is further agreed that this instrument evidences the whole agreement of said parties, and cannot be changed, modified or supplemented by any agent or other persons except in writing, approved in writing, by an elected executive officer of SELLER at its home office at Marion, Ohio. No waiver by either party of any default under this Agreement shall be deemed a waiver of any subsequent default.

20. This Agreement shall not become effective until approved in writing by an elected executive officer of SELLER at its home office at Marion, Ohio, within forty-five (45) days from the date first above written, and its acceptance

by other agent of SELLER is subject to such approval within such specified time.

| Received and accepted<br>at Marion, Ohio.<br>Date March 24, 1970 | MARION POWER SHOVEL<br>COMPANY, INC.<br>By ————————————<br>Salesman |
| MARION POWER SHOVEL<br>COMPANY, INC.<br>By (S) R.R. Wanner<br>R.R. WANNER<br>*Treasurer*        (Title) | WILLOWBROOK MINING COMPANY<br>By (S) James Sartori,     Sec'y<br>JAMES SARTORI<br>*Secretary*        (Title) |

By letter dated February 23, 1970, Marion acknowledged receipt of the above order contract and of Willowbrook's check in the amount of $30,000. In a subsequent letter of April 22, 1970, Marion formally acknowledged acceptance of the order contract.

The order contract did not include all of the modifications, or the prices therefor, that were incorporated into the type 7400 dragline which was delivered to Willowbrook on December 28, 1970. On a schedule of fixed assets appended to Willowbrook's U.S. Small Business Corporation Income Tax Return for 1970, Willowbrook listed the total cost of the modified 7400 dragline as $928,190. This figure comprised the purchase price specified in the order contract, the cost of the generator set necessary to operate the dragline, which unit Willowbrook purchased from Motive Parts Co. of Pennsylvania for $90,003 on the basis of the technical data furnished by Marion, and the cost of the additional modifications not contained in the order contract but which components were reflected in supplements to that document.

In their respective individual income tax returns for the taxable year 1970, James and David each claimed an investment credit of $37,953. The investment credits so claimed were with respect to the Marion-type 7400 dragline and another piece of machinery (a tractor which cost approximately $157,000). In the statutory notices issued to James and David, respectively, on October 19, 1973, respondent determined, inter alia, that, as of the close of April 18, 1969, there were no contracts binding on Willowbrook for the purchase of either the aforementioned tractor or the Marion 7400 dragline; accordingly, respondent disallowed the entire amount of the $37,953 investment credit claimed by James and David in their respective returns. Petitioners have conceded that they are not entitled to any

portion of the investment credit attributable to the purchase of the tractor.

OPINION

The sole question for decision is whether the modified Marion-type 7400 dragline purchased and placed in service by Willowbrook, petitioners' wholly owned subchapter S corporation, qualifies as pre-termination property under section 49(b) such that petitioners are entitled to the investment credit claimed by them in 1970 in respect of that dragline.[2]

Code section 38 provides a tax credit for investments in certain depreciable property. Section 48 defines qualifying "section 38 property." However, section 49, as originally enacted by section 703(a), Tax Reform Act of 1969, 83 Stat. 487, provided as follows:

SEC. 49. TERMINATION OF CREDIT.

(a) GENERAL RULE.—For purposes of this subpart, the term "section 38 property" does not include property—

(1) the physical construction, reconstruction, or erection of which is begun after April 18, 1969, or

(2) which is acquired by the taxpayer after April 18, 1969, other than pre-termination property.

(b) PRE-TERMINATION PROPERTY.—For purposes of this subpart—

(1) BINDING CONTRACTS.—Any property shall be treated as pre-termination property to the extent that such property is constructed, reconstructed, erected, or acquired pursuant to a contract which was, on April 18, 1969, and at all times thereafter, binding on the taxpayer.

Since the Marion 7400 dragline at issue herein was not actually acquired by Willowbrook until December 28, 1970, well after the April 18, 1969, cutoff date specified in section 49, section 49(a)(2) operates to disallow any investment credit in respect of the dragline (which the parties agree would otherwise constitute section 38 property) unless the dragline qualifies as pre-termination property under section 49(b)(1). Thus, we must decide whether the Marion 7400 dragline was acquired pursuant

---

[2] This passthrough of Willowbrook's investment credit to petitioners is effected pursuant to sec. 48(e):

SEC. 48. DEFINITIONS; SPECIAL RULES.

(e) SUBCHAPTER S CORPORATIONS.—In the case of an electing small business corporation (as defined in section 1371)—

(1) the qualified investment for each taxable year shall be apportioned pro rata among the persons who are shareholders of such corporation on the last day of such taxable year; and

to a contract which, as of April 18, 1969, and at all times thereafter, was binding upon Willowbrook.

As noted in our findings, *supra,* the order contract evidencing the written agreement between Marion and Willowbrook was not entered into until February 18, 1970, and therefore, as both respondent and petitioners recognize, cannot serve as a basis for application of section 49(b). Petitioners contend, however, that notwithstanding the absence of a written contract as of April 18, 1969, a binding contract as required by section 49(b)(1) was created by virtue of the respective oral commitments made by Marion and Willowbrook at the February 18, 1969, meeting at Marion's offices; at that time, Marion agreed to build and Willowbrook agreed to purchase a dragline that satisfied those specifications which Willowbrook had previously presented and which Marion had previously ascertained to be feasible. Petitioners assert that both Marion and Willowbrook also agreed as to the determination of the total cost to Willowbrook. In view of the further fact that after February 18, 1969, Marion proceeded to perform the necessary engineering work, petitioners conclude that Marion and Willowbrook intended to and did enter into a binding oral contract in respect of the dragline in issue at that time.

Respondent, on the other hand, argues that neither a formal (written) nor an informal (oral) contract existed which was binding upon Willowbrook as of the statutory cutoff date. Respondent characterizes the meeting on February 18, 1969, as merely a stage in the preliminary negotiations between Marion and Willowbrook that culminated in a binding contract only upon the execution and/or acceptance of the written order contract. Respondent points, for example, to the fact that in May 1969 Marion proposed and Willowbrook rejected a modified type 195M dragline as evidence that, contrary to petitioners' allegations, no prior binding agreement had been reached. Even were we to find that Marion and Willowbrook formed an oral contract at the February 18, 1969, meeting, respondent argues, as more fully discussed *infra,* that the purported contract was not binding as required by section 49(b)(1).

In sum, the issue presented requires us to determine for purposes of the application of the binding contract rule of section 49(b)(1) whether, as of April 18, 1969, and at all times thereafter, Willowbrook was subject to a binding contract, albeit

oral, for the purchase of the modified Marion 7400 dragline in respect of which petitioners claimed an investment credit in 1970. Since no regulations were promulgated under section 49, we perforce turn to the legislative history thereof to guide our inquiry. Both committee reports, H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, and S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, provide the following explanation for the application of section 49(b)(1):

the investment credit is to be available with respect to property which is constructed (reconstructed or erected) or acquired pursuant to a contract that was binding on the taxpayer at the close of April 18, 1969, and at all times thereafter. * * *

Whether or not an arrangement between a taxpayer and a builder or supplier constitutes a contract is to be determined under the applicable local law. A contract for this purpose may be oral or written. However, in the case of an oral contract, the taxpayer must establish by appropriate evidence that the contract was in fact entered into before the close of April 18, 1969. This may be done by memorandums, the conduct of the parties or other evidence that a contract was in fact entered into. State law as to the effect of "part performance," and as to when a seller has accepted an order will apply.

A *binding* contract for purposes of this provision exists only with respect to the property which the taxpayer is *obligated to accept* under the contract. * * *

A contract may be considered binding on a taxpayer even though (*a*) the price of the item to be acquired under the contract is to be determined at a later date, (*b*) the contract contains conditions the occurrences of which are under the control of a person not a party to the contract, or (*c*) the taxpayer has the right under the contract to make minor modifications as to the details of the subject matter of the contract. * * *

On the other hand a contract which is binding on a taxpayer on April 18 will not be considered binding at all times thereafter if it is substantially modified after that date. * * *

[H. Rept. No. 91-413, *supra,* and S. Rept. No. 91-552, *supra,* 1969-3 C.B. at 314-315 and 568-569, respectively. Emphasis supplied.]

Both reports also indicate that the binding contract rule is, in general, similar to that provided by Congress in 1966 in connection with the suspension of the investment credit effected by section 48(h).[3] (H. Rept. No. 91-413, *supra,* 1969-3 C.B. at 312,

---

[3] Sec. 48(h) provides in pertinent part:

(h) SUSPENSION OF INVESTMENT CREDIT.—For purposes of this subpart—

(1) GENERAL RULE.—Section 38 property which is suspension period property shall not be treated as new or used section 38 property.

(2) SUSPENSION PERIOD PROPERTY DEFINED.—Except as otherwise provided in this subsection and subsection (i), the term "suspension period property" means section 38 property—

(A) the physical construction, reconstruction, or erection of which begins either during the suspension period or pursuant to an order placed during such period, or

and S. Rept. No. 91-552, *supra*, 1969-3 C.B. at 566). In this regard, H. Rept. No. 2087, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 916, 917 stated:

Paragraph (3) of section 48(h), as added by the bill, provides that, to the extent that any property is constructed, reconstructed, erected, or acquired pursuant to a contract which was, at the close of September 8, 1966, and at all times thereafter binding on the taxpayer, such property shall not be deemed to be suspension period property. (Hereinafter in this report, a reference to a binding contract or lease in effect on September 8, 1966, is a reference to a contract or lease which was in effect at the close of September 8, 1966, and was binding at all times thereafter.)

A contract is *binding* on the taxpayer for purposes of this rule if: (1) The contract (whether written or oral) is *enforceable against the taxpayer under applicable State law;* (2) the taxpayer's failure to perform would subject him to liability for damages or to a forfeiture of a down payment or a deposit; and (3) the amount of such liability for damages is not limited by the terms of the contract, or if contractually limited, the liability or forfeiture is more than nominal taking into account the total purchase price of the property which is the subject of the contract. [Emphasis supplied.]

See also S. Rept. No. 1724, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 925, 943-944.

It is apparent from the legislative history of section 49(b)(1), and that of the analogous provisions of section 48(h)(3), that the existence of a binding contract is to be determined under the applicable State law. In the instant case, the alleged contract upon which petitioners rely involves a corporation organized and operating in Pennsylvania (Willowbrook) and a corporation with offices and business operations in Ohio (Marion). Thus, a conflict exists as to which law, Pennsylvania or Ohio, applies to determine the contract in issue. The instant case was tried in Pittsburgh, Pa., and we look to the law of the forum State, which has adopted a rule requiring application of the law of "the place with the most significant relationship to the parties and the transaction," *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210-1211 (3d Cir. 1970), cert. denied 400 U.S. 826 (1970). Further, "the formal validity of a contract is determined by the law of the state in which the contract was made." *Linn v.*

---

(B) which is acquired by the taxpayer either during the suspension period or pursuant to an order placed during such period.

(3) BINDING CONTRACTS.—To the extent that any property is constructed, reconstructed, erected, or acquired pursuant to a contract which was, on October 9, 1966, and at all times thereafter, binding on the taxpayer, such property shall not be deemed to be suspension period property.

*Employers Reinsurance Corp.*, 392 Pa. 58, 139 A.2d 638, 639 (1958). Since petitioners rely on the formation of a contract at the February 18, 1969, meeting in Marion's Ohio offices and in view of the fact that the subsequently executed order contract provides in paragraph 18 that Ohio law is to govern, we think that the Pennsylvania choice-of-law rule warrants application of Ohio law. We note that, as a practical matter, there is no significant difference between the Ohio and Pennsylvania law determinative of the issue herein since both States have enacted the Uniform Commercial Code. See and compare Ohio Rev. Code Ann. sec. 1302.04 (1962), and Pa. Stat. Ann. tit. 12A, sec. 2-201 (1970).[4]

Accordingly, in order to ascertain whether the oral agreement reached by Marion and Willowbrook constituted a binding contract for purposes of section 49(b)(1), we look to its enforceability under Ohio law and specifically section 1302.04 of the Ohio Revised Code which provides as follows:

Sec. 1302.04 (UCC 2-201) Formal requirements; statute of frauds.

(A) Except as otherwise provided in this section a contract for the sale of goods [5] for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.

(B) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of division (A) of this section against such party unless written notice of objection to its contents is given within ten days after it is received.

(C) A contract which does not satisfy the requirements of division (A) of this section but which is valid in other respects is enforceable:

(1) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(2) if the party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract for sale was made, but the

---

[4] See also the discussion on this point in *Editors Press, Inc. v. United States,* (D. Md. 1975, 36 AFTR 2d 75-5395, 75-2 USTC par. 9595).

[5] The dragline involved herein constitutes "goods" as that term is defined in sec. 1302.01(A)(8) of the Ohio Revised Code.

contract is not enforceable under this provision beyond the quantity of goods admitted; or

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted in accordance with section 1302.64 of the Revised Code.

As explained in comment 4 thereunder, "Failure to satisfy the requirements of this section does not render the contract void for all purposes, but merely prevents it from being judically enforced in favor of a party to the contract." Thus, assuming arguendo that by virtue of the oral representations made at the February 18, 1969, meeting, Marion and Willowbrook did in fact form an oral contract, that contract must comply with the requirements of the statute of frauds to be enforceable and therefore binding upon Willowbrook. See *Sadler Machinery Co. v. Ohio Nat.,* 202 F.2d 887 (6th Cir. 1953).

Since there was no written agreement between Willowbrook and Marion prior to April 18, 1969, determination of whether a binding contract existed as of that date depends on the application of section 1302.04(C)(1).[6] While we believe that there is ample evidence to support a finding that the dragline in issue constituted specially manufactured goods for purposes of subsection (C)(1), we do not believe that petitioners have established that Marion made the requisite "substantial beginning" as to the dragline's design and manufacture. We emphasize here the time frame; that is, in order for the purported oral contract to be binding and enforceable as of April 18, 1969, petitioners must prove that within the 2 months that followed the meeting on February 18, 1969, Marion in fact accomplished this "substantial beginning." While we believe that Marion may have proceeded with some design work, petitioners have not presented sufficient evidence by which we might ascertain the extent of Marion's performance. The fact that in May 1969 Marion proposed to provide a modified type 195M dragline, which proposal was rejected, coupled with the further fact that the type 7400 was not proposed until December 1969, militates against a finding that by April 18, 1969, Marion had begun substantial rather than tentative design in respect of the dragline for Willowbrook. Additionally we note that it was upon the

---

[6] Petitioners did not argue that the oral contract would be enforceable under sec. 1302.04(B). In our opinion the written contract dated Feb. 18, 1970, even if representative of an oral contract entered into on Feb. 18, 1969, would not satisfy the requirement of par. (B) that written confirmation be received within a reasonable time.

technical data provided by Marion that Willowbrook ordered the generator set to power the dragline. That equipment was not, however, purchased until sometime in mid-1970, which further suggests that it is unlikely that Marion had, by April 18, 1969, substantially begun to develop the engineering information in respect thereof. Thus, absent some specific evidence as to what work Marion actually began prior to April 18, 1969, in order to design and build a dragline to Willowbrook's specifications, we cannot find that petitioners satisfy the exception to the statute of frauds provided in section 1302.04(C)(1) and accordingly conclude that no binding contract existed as of April 18, 1969.

Moreover, although local law is determinative of the existence and legal effect of a contract, both the House and Senate committee reports specify that "A binding contract for purposes of this provision [sec. 49(b)(1)] exists only with respect to the property which the taxpayer is obligated to accept under the contract" and that "a contract which is binding on a taxpayer on April 18 will not be considered binding at all times thereafter if it is substantially modified after that date." H. Rept. No. 91-413, *supra,* 1963-3 C.B. at 314-315; S. Rept. No. 91-552, *supra,* 1969-3 C.B. at 569. Measured against these congressionally provided guidelines, the fact that Willowbrook rejected Marion's proposal of May 1969 to provide a modified type 195M dragline casts doubt as to whether Willowbrook was "obligated to accept" a dragline at all or if so, what particular model. Similarly, Willowbrook's rejection of the proposed 195M type, coupled with the fact that the 7400 type was not agreed upon until December 1969, might further constitute a substantial modification and thereby preclude application of section 49(b)(1).

As stated above, we assumed for purposes of the application of section 1302.04(C)(1) that the February 18, 1969, meeting did result in the formation of an oral contract. However, we are doubtful that on the evidence presented we could find that an oral contract was then created.

In *General Motors Corp. v. Keener Motors,* 194 F.2d 669, 675-676 (6th Cir. 1952), a case involving Ohio law, the court said:

To be binding in law, an agreement must be definite and certain. An offer must be so definite in its terms, or must require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain. Restatement of the Law of Contracts, section 32. No person may be subjected by law to a contractual obligation, unless the character of the

obligation is definitely fixed by an express or implied agreement of the parties. If the obligation to become binding rests on a future agreement to be reached by the parties, so that either party may refuse to agree, there is no contract. In other words: As long as both parties contemplate that something remains to be done to establish contractual relationship, no contract has been made. It would seem that these principles should be recognized as universally accepted.

In *Litsinger Sign Co. v. American Sign Co.,* 11 Ohio St. 2d 1, 227 N.E. 2d 609, 619 (1967), the Ohio Supreme Court said:

It is settled law that if the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect, "making a contract for the parties," no enforceable obligation results. * * *

Pennsylvania law is in accord. In *Fahringer v. Strine's Estate,* 420 Pa. 48, 216 A. 2d 82 (1966), the Pennsylvania court said at page 88:

The first essential of any contract is the existence of a *promise* or an *offer* to enter into a contract. Such promise must be definite and certain and an intention to do an act does not constitute an offer or a promise to do it. * * *

James' testimony with regard to the meeting on February 18, 1969, indicates that he discussed at great length with Marion's representatives Willowbrook's specifications and how they might be met. After these discussions the Marion representatives apparently said they could or thought they could design a dragline to meet those specifications, and James said that if they could do so Willowbrook would buy the equipment. There was apparently no agreement or meeting of the minds on what type equipment components would be used, when the equipment would be delivered, or how much Willowbrook would pay for it. We do not believe James committed Willowbrook, or had authority to do so, to purchase just anything Marion came up with at any price. Such is negated by James' rejection of the modified type 195M dragline in May 1969. While James may have given Marion the understanding that Willowbrook would enter into a mutually agreed upon contract to purchase the equipment if Marion could satisfy its requirements, we have no evidence that by April 18, 1969, Marion had progressed to the point that it was certain it could do so. Until that time, at the earliest, there would be no binding contract.

Furthermore, focusing on the order contract that was subsequently executed by Marion and Willowbrook, we note that

paragraph 13 refers to "buyer's offer to purchase" and that the contract specifically required formal acceptance by Marion, both of which constitute further indicia that no binding contract existed at any time prior to such acceptance. Not only does the acceptance provision of the order contract suggest that Marion's employees present at the February 18, 1969, meeting lacked the capacity to contract on behalf of Marion but also the fact that Willowbrook did not formally authorize James to enter into a contract for the purchase of the dragline until January 1970 indicates that neither Marion nor Willowbrook considered itself contractually bound as of April 18, 1969.

In view of the foregoing analysis, petitioners' reliance on the Uniform Commercial Code provisions of section 2-204(1)[7] is misplaced. As we have discussed, even assuming arguendo that an oral contract was formed prior to the statutory cutoff date, the existence of the contract, while a necessary condition, is not sufficient for qualification under section 49(b)(1); that is, petitioners' argument merely begs the further question of whether the contract was a binding and enforceable contract, which question we have resolved in the negative. See Official Comment, n. 7 *supra.*

Nor is the doctrine of promissory estoppel availing to petitioners. Quite succinctly, we have no evidence of the requisite elements of reliance and detriment on the part of either Marion or Willowbrook.

As Congress itself acknowledged in the following excerpt pertaining to the equipped building rule of section 49(b)(2):

> It is recognized, of course, that there are various types of commitments which are made before physical construction has commenced or a binding contract has been entered into which, although they occurred before April 19, do not result under the bill in the allowance of the investment credit. In part, these were not taken into account because their varied nature make it impossible to specify with certainty in the statute those cases where the investment credit would be available and those cases where it would not. [H. Rept. No. 91-413, *supra,* 1963-3 C.B. at 316.]

---

[7] As provided in Ohio Rev. Code Ann. sec. 1302.07 (UCC 2-204):

(A) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

The Official Comment relating thereto states that—

"Division (A) continues without change the basic policy of recognizing any manner of expression of agreement, oral, written or otherwise. *The legal effect of such an agreement is, of course, qualified by other provisions of this Chapter.* [Emphasis supplied.]"

We hold that the Marion 7400 dragline purchased by Willowbrook does not qualify as pre-termination property under section 49(b)(1) because the dragline was not acquired pursuant to a contract which, as of April 18, 1969, and thereafter, was binding upon Willowbrook; accordingly, petitioners are not entitled to the investment credit claimed by them in 1970 in respect of that dragline.

*Decisions will be entered for the respondent.*