Sunbury Textile Mills, Inc., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 8280–74.    Filed July 21, 1977.

*John B. Huffaker* and *David Milne,* for the petitioner. *Gerald V. May, Jr.,* for the respondent.

Wilbur, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax of $840 for the taxable year ending April 30, 1970, and $69,607 for the taxable year end-

ing April 30, 1971. These deficiencies were based on respondent's determination that property on which the petitioner had claimed the investment credit did not qualify as "section 38 property." Petitioner contends that such property was acquired pursuant to a contract which was binding on April 18, 1969, and which therefore qualified for the investment credit as pre-termination property under section 49(b).[1] Respondent contends that it was purchased under an option which did not become a binding contract until exercised in December 1969. The issue for our determination is whether the contract was binding as to the property in question on April 18, 1969.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner Sunbury Textile Mills, Inc., is and was at the time of filing of the petition and returns herein a Delaware corporation having its principal place of business at End of Miller Street, Sunbury, Pa. The returns for the taxable years in issue were filed with the Office of the District Director of Internal Revenue at Philadelphia, Pa.

Petitioner was incorporated in 1954 to purchase the assets and business of Susquehanna Mills of Sunbury which had gone into bankruptcy and was closing down. After the first 2 years of operation, the business proved to be consistently profitable.

Petitioner was in the textile business during the taxable years in issue, operating both processing and weaving divisions. The processing division consisted of dyeing and finishing polyester, acrylic, and blended knit fabrics and bonding or laminating knit or woven material. The weaving division, until 1970, manufactured upholstery, drapery, and apparel jacquard fabrics for sale to manufacturers, jobbers, chains, and selected converters.

By 1965 petitioner's looms were becoming relatively old. It initiated a modernization program in its weaving division for

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

the purposes of increasing the speed and efficiency and, therefore, the profitability of that division.

After 1965, the weaving division accounted for 60 percent of the company's sales but was less profitable than the processing division. By 1969 that division was losing money. Petitioner expected growth in the weaving of the textile area because of the introduction of better looms and fibers. Therefore, to remain competitive, petitioner planned to replace its old c–4 looms with modern, high-speed shuttleless looms.

In approximately 1967, petitioner began to explore the market for a loom able to weave jacquard upholstery fabric. One of the firms contacted was Crompton & Knowles Corp. (hereinafter C. & K.), which was in the business of building weaving machines for fancy fabrics. While some standard parts and essentially standard features were used, C. & K. also substantially customized the looms that it sold in accordance with the particular needs of the buyer. After examining shuttleless looms which manufacturers claimed would be good for upholstery weaving, it was finally determined that C. & K.'s new Outside Filling Supply (hereinafter OFS) loom was the best model currently available. This type of loom was shuttleless and had an outside yarn supply. It eliminated the quilling operation and produced fabric at a greater rate of speed. The shuttleless looms which C. & K. and other companies were developing were significantly different from and superior to prior models. Petitioner calculated that in one of its main styles of fabric the average pack construction would cost 50 cents per yard less to manufacture on the high-speed shuttleless loom than on its current equipment.

Gordon G. Matheson (hereinafter Matheson) was petitioner's president and was principally responsible as petitioner's representative during the negotiations with C. & K. for the purchase of the OFS looms. Henry C. Wingard (hereinafter Wingard) was the domestic sales manager of C. & K. and personally negotiated the sale of the OFS looms to petitioner. In addition, he had overall responsibility for starting up the looms and making them perform for Sunbury, since the C. & K. service department was under his

jurisdiction. Wingard later left C. & K. under amicable circumstances.

Wingard, as C. & K.'s representative, sent Matheson, as representative of petitioner, a letter dated February 27, 1969, which was entitled "Proposal for New OFS looms." Pertinent portions of the letter stated as follows:

We believe that the proposal we have now worked out does offer the best approach we can give in regard to being able to make continuous shipment and still at the same time allow for your people to make some evaluation of the first looms which are installed, before proceeding with the entire order, and our proposal is as follows:

1. If we can have your order for seventy-two new OFS looms by Friday, March 7, 1969, we would ship the first twelve looms in July in order to let your people get started with training and evaluation. (This would be before our shut-down for vacation.) The next twelve looms would then follow in September.

2. You would then let us know by September 15, 1969, whether you wished to cancel the balance of forty-eight looms, or have us proceed to build them for you. There would be no cancellation charge, provided we hear from you by September 15, 1969.[2]

\* \* \*

4. In order to offer you terms, and also assist our people in moving the paper, we would want three contracts for twenty-four looms each, and our Treasurer's Office would work with you on the financing. You would be expected to sign the usual financing statements and security agreements; and this would be done simply to cover three separate lots of twenty-four looms each, to make a total of seventy-two looms.

5. Terms would be 20% down at the time of shipment of the first looms under each contract. The balance of 80% would be payable over five years with twenty quarterly payments, starting ninety days after shipment of the first looms on each contract.

At a meeting of petitioner's board of directors on March 4, 1969, the following two resolutions were unanimously approved by the board:

RESOLVED, That management be authorized to purchase 72 OFS C & K shuttleless looms as per letter of February 27, 1969, from Mr. Henry C. Wingard of C & K. Contract price is $684,948.00. Each group of 24 looms shall be on a separate contract payable 20% cash at the time of shipping the

---

2 The word "September" when first used in this paragraph has a line drawn through it and "October" handprinted above it. "September" in the second sentence also has a line drawn through it and "October" printed below it. Although there was no direct testimony as to when or why this occurred, it appears that the change was made to reflect the agreement of the parties that petitioner would have until October rather than September to exercise its cancellation right.

first looms. The balance of 80% is payable over five years in 20 equal quarterly installments starting 90 days after shipment of the first looms on each contract. Management is authorized to proceed with an alternate method of financing the loom purchase through state and government agencies if better terms can be secured.

RESOLVED, That management be authorized to commence work on a new building of approximately 62,000 sq. ft. for the Weaving Division. The first steps shall be the application for a PIDA loan for financing 40% of the building costs, application for loans from local banks and the SBA for financing 50% of the building costs, and the application for a loan from SIDCA for financing the remaining 10% which is the company or community responsibility. The architect for the building will be Stan Seiple, Jr., who will commence work immediately. When the finished plans for the building are received, bids for construction shall be gotten. Efforts will be continued to get all necessary permissions required from Philadelphia Life Insurance Co. and The First National Bank of Sunbury for the construction of this building. No building contracts will be let until all permissions are obtained.

Although the resolutions were passed unanimously, some of the directors did express doubts at the meeting concerning the C. & K. OFS looms due to their mechanical problems at other mills. C. & K. was unable to guarantee that the 72 looms would work in petitioner's mill.

The new building authorized at the meeting was part of petitioner's expansion and modernization plan. It had required additional space since 1966 when a 22,500-square-foot building was purchased in Sunbury. The proposed 62,000-square-foot new building to house the weaving operation would release much needed space for the continued expansion of the processing division. The building was to be air-conditioned in order to allow the high-speed OFS looms to operate at a near full capacity and maximum productivity.

By a letter from Wingard to Matheson dated March 6, 1969, C. & K. confirmed the order petitioner had made by telephone the previous day to proceed with the construction of the first 24 OFS looms as outlined in the February 27, 1969, letter, and to modify the shipping schedule such that petitioner was to have until October 15, 1969, to notify C. & K. whether to cancel the balance of the 48 OFS looms or to proceed with their construction. However, petitioner also informed C. & K. that it had to check with the Philadelphia Life Insurance Co. in regard to proceeding with the order for the looms. This was necessitated by the terms of a mortgage between petitioner, the Philadelphia Life Insurance Co., and the First National

Bank of Sunbury executed on July 15, 1966, to secure the principal and performance of a bond agreement. The letter also confirmed the petitioner's request to have one loom shipped in early, during the latter part of May 1969, and also stated that if C. & K. would deliver three looms as soon as possible to facilitate production in the old building in its three most important ranges of fabrics and patterns, then by September 15, petitioner would know how to proceed on the order for the balance of the looms.

By a letter dated March 7, 1969, petitioner informed the Philadelphia Life Insurance Co. and the First National Bank of Sunbury of the planned building and the terms of the loom order as detailed in the February 27, 1969, letter, while indicating that firm commitments would not be made until all permissions were obtained. A memorandum entitled "Modernization Program" enclosed with this letter, stated with respect to the purchase of the 72 looms:

We will be negotiating further with C&K in an attempt to get 3 looms as soon as possible to go into production in the present building on our three most important ranges. If we can do this and begin the production by July, we feel that by September 15 we will know how to proceed on the order for the balance of the looms. The reason for not going beyond 24 looms is because of the possibility of a faster loom being developed for upholstery weaving. The cost savings on these looms permit full amortization in two years. * * *

At the end of this memorandum, the following appears:

We have received a small extension of time from C&K on the March 7 date for placing the loom order.

We have been given until October 15, 1969, to commit for the last 48 looms.

By a March 14, 1969, letter, petitioner informed C. & K. of the approval by the First National Bank of Sunbury of the loom purchase and building.

By a letter dated March 25, 1969, C. & K. forewarded to petitioner a document entitled "Specifications." The specifications included seven typed pages prepared by Wingard of C. & K. Wingard had written specification portions of contracts before although he had no formal legal training. The specification contained inter alia, the following provisions:

Quantity 72     Type Outside Filling Supply Jacquard Looms
* * *

TERMS OF PAYMENT

Total order of seventy-two (72) looms to be divided into three (3) separate sections—each comprising twenty-four (24) looms. The first section to be shipped twelve (12) looms in July 1969, twelve (12) looms in September 1969. The second section to be shipped twelve (12) looms January 1970, twelve (12) looms February 1970. The third section to be shipped twelve (12) looms March 1970, twelve (12) looms April 1970.

Sunbury Mills to notify Crompton & Knowles by October 15, 1969 whether the balance of forty-eight (48) looms representing the second and third sections of the order will remain in force for the specified shipping schedule or if they are to be cancelled. No cancellation charge is involved with the last forty-eight (48) looms if notice of cancellation intent is received by Crompton & Knowles no later than October 15, 1969.

C. & K. inserted the cancellation deadline in the contract to avert the possibility that petitioner would cancel the order for the remaining 48 OFS looms after C. & K. had begun its construction of the looms.

After these seven pages of typewritten specifications came two pages of standardized printed forms. These pages were written by lawyers for C. & K. and were boilerplate provisions written into most of its contracts. Two provisions contained therein stated:

2. The Buyer shall not change or cancel or countermand any part of the order upon which this agreement is based or otherwise cause the work or shipment to be delayed, except with the written consent of and upon terms agreed to by the Seller. * * *

12. This writing is intended by the parties as a final expression of their Agreement and is intended also as a complete and exclusive statement of the terms of their Agreement, and shall not be modified except by a writing signed by the parties. This Agreement shall be governed by the Uniform Commercial Code, as adopted in the State of Massachusetts and as effective and in force on the date of this Agreement. Any action for breach of this Agreement must be commenced within one (1) year after the cause of action has accrued.

The final page was signed by Robert M. Kendrick, vice president and general sales manager, Worcester Textile Machinery Division of C. & K.

On March 28, 1969, petitioner returned the signed formal specifications to C. & K. together with a cover letter and petitioner's purchase order No.2420. The cover letter stated in part, "Enclosed is the signed order with the formal specifica-

tions for the 72 OFS jacquard looms." The purchase order form contained inter alia the following typewritten provisions:

Total order of seventy-two (72) looms to be divided into three (3) separate sections—each comprising twenty-four (24) looms.

* * *

Sunbury Textile Mills will notify Crompton & Knowles by October 15, 1969 whether the balance of forty-eight (48) looms representing the second and third sections of the order will remain in force or to be canceled. No cancellation charge to be made if cancellation is made prior to October 15, 1969.

On April 1, 1969, C. & K. recommended that petitioner purchase the entire lot of $12,000 worth of spare parts since the parts involved loom parts such as transmitters and panels for the looms as well as the OFS mechanism parts. On April 15, 1969, petitioner agreed to accept this suggestion as to the purchase of one total listing for spare parts in the amount of $12,000. A complete set of maintenance parts for 72 looms arrived with the initial 24 looms. One-third of the following items (not spare or maintenance parts but integral parts of each loom), arrived with each set of looms delivered:

| Quantity | Description |
|---|---|
| 72 | Motors and pinions |
| 72 | Pair OFS special temples |
| 72 | Extra filling carriers |
| 144 | Pick counters 3 figures 3 shift 1000/1 ratio |
| 72 | Sets Alemite Lubrication Systems |
| 144 | Loom beams 28" lock ring—all metal |
| 144 | Extra cloth rolls |

The new building in which the looms were to be installed was financed by a loan commitment from the First National Bank of Sunbury (hereinafter First National) and the Philadelphia Life Insurance Co. This loan commitment, however, did not cover the looms. Norman Waltz (hereinafter Waltz), as president of First National, was willing to back petitioner with additional loans for modernization because of his concern as a lender that petitioner maintain its productive capacity and remain competitive. The nature of petitioner's business necessitated a minimum of 72 new high-speed looms in order to make the modernization program technically and commercially practicable and profitable. First National felt that just 24 looms would be insufficient for petitioner to

maintain satisfactory production and thereby cover its debt service on the new building, but was aware of the clause in the agreement between C. & K. and petitioner giving petitioner a right to cancel the order as to 48 of the 72 looms. It was irrelevant to First National which manufacturer's looms were eventually purchased so long as a total of 192 looms (the capacity of the new building) were eventually installed with a satisfactory rate of production.

The initial 24 looms under the agreement were received by petitioner as follows:

| Looms Received | Date | Looms Received | Date |
|---|---|---|---|
| 6 | 8/1/69 | 6 | 9/19/69 |
| 6 | 8/4/69 | 6 | 9/20/69 |

Prior to its contract with petitioner, C. & K. had no experience with adapting the OFS looms for use with jacquard upholstery fabrics of the kind petitioner manufactured; therefore, neither party to the contract could be sure if the looms would function acceptably. C. & K. would not guarantee the performance of the looms and limited its warranties to repair and replacement of defective parts. Petitioner desired to use the first 24 for a test period until it could determine whether the looms could be successfully adapted before irrevocably committing itself to purchase the remaining 48. It continued to urge C. & K. to deliver the looms as early as possible so that it would have time to thoroughly test them. It was in the interest of both parties to the contract to adapt the looms to petitioner's needs, and both sides worked to achieve this goal.

It was not until some months after the contract was signed and the initial 24 looms were delivered that petitioner was convinced the looms would perform properly. By mutual agreement, the period during which petitioner was entitled to cancel as to the latter 48 looms was extended so that the final commitment was not given by petitioner and acknowledged by C. & K. until some time in December 1969.

The second group of 24 looms was received by petitioner in March and April of 1970 while the third group of 24 looms was received in May and June of 1970. These contained somewhat different specifications from each other and from

the original 24 looms. However, it was normal in the textile industry to perfect the looms on the mill floor, and it was clear from the beginning that minor modifications would be made as they discovered what would be necessary to properly adapt the looms. C. & K. waited until notified by petitioner that the remaining 48 looms would not be canceled to purchase components needed in meeting petitioner's specific requirements, but ordered other components which could have been used in filling other orders if petitioner exercised its cancellation privilege.

## OPINION

The issue presented for our decision is whether looms purchased by petitioner qualify as pre-termination property under section 49(b), thereby entitling petitioner to the investment credit it claimed on its 1970 and 1971 tax returns.

Petitioner purchased 72 looms under a written contract made in March 1969. This contract provided that the total order of 72 looms was to be divided into three separate sections—each comprising 24 looms. The first section was to be shipped in July and September 1969; the second in January and February 1970; and the third in March and April 1970. It was further provided that the petitioner was to notify the seller "by October 15, 1969 whether the balance of forty-eight (48) looms representing the second and third sections of the order will remain in force * * * or if they are to be cancelled." No cancellation charge would be imposed if the notice of cancellation was received by that date. The time period was later extended into December of 1969. The order was never canceled and petitioner received all 72 looms.

Section 49(a) denies the investment credit to property acquired by the taxpayer after April 18, 1969,[3] unless the property is "pre-termination property." Section 49(b)(1)

---

[3] SEC. 49. TERMINATION FOR PERIOD BEGINNING APRIL 19, 1969, AND ENDING DURING 1971.

(a) GENERAL RULE.—For purposes of this subpart, the term "section 38 property" does not include property—

(1) the physical construction, reconstruction, or erection of which is begun after April 18, 1969, or

(2) which is acquired by the taxpayer after April 18, 1969, other than pretermination property.

This subsection shall not apply to property described in section 50.

\defines pre-termination property to include property "acquired pursuant to a contract which was, on April 18, 1969, and at all times thereafter, binding on the taxpayer."[4]

We must decide whether the contract before us was a binding contract within the meaning of section 49(b)(1). Respondent contends that the contract in issue was a binding contract to purchase 24 looms with an option to purchase the remaining 48.[5] In this connection, respondent cites the contractual provision permitting the petitioner to cancel the contract by October 15, 1969, without incurring a cancellation charge. Petitioner argues, however, that its right to cancel the contract was not absolute, but rather that it could only cancel the contract if C. & K., the seller, could not adapt the looms successfully to petitioner's requirements. We agree with respondent.

Both the House and the Senate reports include the following relevant guidelines on what constitutes a "binding contract" under section 49(b)(1):

Whether or not an arrangement between a taxpayer and a builder or supplier constitutes a contract is to be determined under applicable local law. * * *

A binding contract for purposes of this provision exists only with respect to the property which the taxpayer is obligated to accept under the contract. * * * In addition, where a contract obligates a taxpayer to purchase a specified number of items and also grants him an option to purchase additional items, the contract is binding on the taxpayer only to the extent of the items he must purchase. * * *

* * *

where a contract contains a condition which is under the control of one of the parties to the contract and this party is obligated (either by the specific terms of the contract itself or by operation of State law) to use his best effort to secure the occurrence of the condition, the existence of the condition in the contract does not prevent the contract from being one which is binding on the taxpayer. * * *

---

[4] SEC. 49(b)

(b) PRE-TERMINATION PROPERTY.—For purposes of this subpart—

(1) BINDING CONTRACTS.—Any property shall be treated as pre-termination property to the extent that such property is constructed, reconstructed, erected, or acquired pursuant to a contract which was, on April 18, 1969, and at all times thereafter, binding on the taxpayer.

[5] It is conceded by respondent that petitioner was bound as to the purchase of the first 24 looms and that they therefore qualify for the investment tax credit. The dispute remains over the 48 looms comprising the last two sections under the contract.

* * *

Where an order for the purchase of property may be canceled by the purchaser within a specified period of time, such as 90 days, the order is a contract binding on the purchaser if the period of time had expired before April 19, 1969, or the right to cancel the contract had been terminated before that date by partial performance with the buyer's consent. * * * [H. Rept. 91–413 (1969), 1969–3 C.B. 200, 314–315; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 569–570.][6]

We turn first to the terms of the written contract. The critical language states:

Sunbury Mills to notify Crompton & Knowles by October 15, 1969 whether the balance of forty-eight (48) looms representing the second and third sections of the order will remain in force for the specified shipping schedule or if they are to be cancelled. No cancellation charge is involved with the last forty-eight (48) looms if notice of cancellation intent is received by Crompton & Knowles no later than October 15, 1969.

We begin by noting the total absence of any mention of a limitation on petitioner's cancellation right in both the contract itself and the written documents which attended its negotiation. Experienced executives of two corporations negotiated this contract at arm's length. The contract covered nine pages and reveals the careful consideration which went into it. The negotiations and drafting of the agreement occurred over several months with a frequent exchange of letters and communications. Yet, nowhere is there any mention of a limitation on petitioner's cancellation right.

This silence as to any limitations on petitioner's right to cancel is all the more significant in light of the fact that

---

[6] Both parties agree that State law determines the binding effect of their contract (*Sartori v. Commissioner*, 66 T.C. 680, 689 (1976)), and that the applicable State law herein is the Uniform Commercial Code of Massachusetts, Mass. Gen. Laws Ann. ch. 106, secs. 1–101 et seq. (1976). See Official Comment 1 to this section and also Restatement (Second), Conflict of Laws, sec. 187 (1971). The parties also agree that Massachusetts law is identical to Pennsylvania law as it relates to the relevant U.C.C. provisions.

Respondent also invokes the parol evidence rule, but since we do not find the evidence objected to helpful to petitioner's cause, the facts do not require an extended analysis of the parameters of the parol evidence rule. But cf. *Estate of Craft v. Commissioner*, 68 T.C. 249 (1977). Additionally, the use of the critical word "cancel" in the contract, and the apparent conflict between the cancellation clauses of the contract appear to bring the evidence received within a well-recognized exception to the rule which allows oral testimony to establish the meaning of an ambiguous word or phrase. *Gainsboro v. Shaffer*, 339 Mass. 1, 157 N.E.2d 536 (1959); 2 Williston, Sales, sec. 13–8, pp. 84–87 (4th ed. Squillante & Fonseca 1974).

Wingard, the representative of C. & K., drafted the critical language of the contract. If the parties to the contract had agreed upon a limitation to petitioner's cancellation right, it would obviously be to C. & K.'s benefit to make that clear in the written contract. The fact that Wingard, who was experienced in drafting contracts for C. & K., did not put such a provision in this contract, involving nearly a million dollars in looms, indicates that no such limitation was agreed upon.

When the terms of the contract are illuminated by the surrounding documents it becomes perfectly clear that petitioner was not obligated to accept the remaining 48 looms pursuant to a binding contract. The proposal "worked out" was reduced to writing in the letter from Wingard to Matheson on February 27, 1969. The proposal was designed to "allow for your people [Sunbury] to make some evaluation of the first looms * * * installed, *before proceeding with the entire order.*" (Emphasis added.) By September 15, 1969, after the evaluation period allowed for had been utilized, the letter required petitioner to notify C. & K. whether it "wished to cancel the balance of forty-eight looms, or have us proceed to build them for you." A timely direction to proceed no further would involve "no cancellation charge."

Shortly thereafter, Sunbury's board of directors authorized management to act on the proposal in this letter. In securing the acquiescence of prior financial backers to move forward on the proposal, petitioner forwarded a memorandum stating that if Sunbury could secure the three looms for early testing:

we feel that by September 15 we will know how to proceed on the order for the balance of the looms. *The reason for not going beyond 24 looms is because of the possibility of a faster loom being developed for upholstery weaving.* [Emphasis added.]

The end of the memo stated that "we have been given until October 15, 1969, *to commit* for the last 48 looms." (Emphasis added.) In accord with the clear understanding of the parties, we note that C. & K. deferred the purchase of any special order parts usable only in filling petitioner's order until after it was notified to proceed with the remaining 48 looms.

Yet another significant factor is the commercial context in which the sale occurred. Petitioner wanted to buy OFS looms, but C. & K. could not guarantee that its looms would be adaptable to petitioner's needs. In addition, members of

petitioner's board had qualms about C. & K. because of problems others had with its looms. It was therefore in petitioner's best interests to commit itself as little as possible while obtaining C. & K.'s commitment to supply more looms at a fixed price if petitioner should desire them. Since petitioner had been considering other manufacturers' looms, and since OFS looms were a new technological development, it was reasonable for it to anticipate the possibility of better quality looms being developed by another company which it would be free to purchase. The correspondence surrounding the sale indicates the tentative nature of the transaction with respect to the 48 looms. As noted, the letters speak of a test period to permit an "evaluation" of the looms before being required "to commit" or "before proceeding with the entire order." And every document associated with the transaction fragmented the looms into three separate groups of 24 looms.

Petitioner elicited considerable testimony attempting to explain what Sunbury meant when it advised its financial backers that it was not going beyond 24 looms "because of the possibility of a faster loom being developed for upholstery weaving." In the end the testimony was, to put it generously, quite unconvincing. Nor was the testimony on similar language in the other documents sufficiently compelling to give the language an awkward and unusual construction.

Petitioner nevertheless attempts to save the day by focusing on the term "cancel" as used in the contract. It contends that the parties intended to create a right to abrogate the contract as to the 48 looms only for cause because "cancellation" is defined in the Uniform Commercial Code as an ending of the contract *for cause*. Respondent's position is that the term was not intended to be given a technical meaning, and that petitioner possessed an unlimited right of "termination" as that word is defined in the U.C.C. These two terms are defined in U.C.C. section 2–106 (Mass. Ann. Laws ch. 106, sec. 2–106 (1976)), as follows:

(3) "Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.

(4) "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination"

except that the cancelling party also retains any remedy for breach of the whole contract or of any unperformed balance.

We do not find petitioner's reasoning persuasive. It is not the intent of U.C.C. section 2–106 to define words as they are used in everyday contracts, but rather to give a precise, technical definition to terms used frequently in article 2 of the U.C.C. Official Comment 3 to U.C.C. section 2–106 makes this clear when it states that, "These subsections are intended to make clear the distinction carried forward *throughout this Article* between termination and cancellation." (Emphasis added.) Since Wingard, the author of the passage in question, was not trained in law, it is much more reasonable in gleaning the intent of the parties, to give the term its ordinary meaning rather than the specialized connotations of the U.C.C.[7]

Normally the word cancel means "to remove from significance or effectiveness." Webster's Third New International Dictionary 325 (1971). Courts, in interpreting cancellation provisions in contracts both before and since the adoption of the U.C.C., have not given the word the restrictive interpretation petitioner here advocates. Frequently cancellation has been equated with termination to refer to an abrogation of all contractual rights including the right to damages. *Hampton v. Commercial Credit Corp.*, 119 Mont. 476, 176 P.2d 270, 279 (1946). Similarly, in *Schwartz v. Van Winkle*, 47 N.Y.S.2d 264, 265 (N.Y. County Sup. Ct. 1944), affd. 268 App. Div. 984, 52 N.Y.S.2d 583 (1944), the court stated that "the word 'cancellation' refers to the termination of the agreement, prior to the date of its expiration and in accordance with its provisions." See also *Mamula v. McCulloch*, 275 Cal. App.2d 184, 79 Cal. Rptr. 571, 578 (2d Dist. Ct. App. 1969); *Acme Mills v. Tanner-Brice Co.*, 112 F.2d 910 (5th Cir. 1940); Black's Law Dictionary 259 (4th ed. 1968).

The committee reports to section 49(b)(1) also illustrate the use of the word "canceled" to refer to a power to abrogate the contract at will.

---

[7] Although Wingard testified at the trial, he said nothing helpful about what he meant by "cancel." There is no evidence, however, that he either knew of the U.C.C. or intended the word to be given the definition described in U.C.C. sec. 2–106(4).

Where an order for the purchase of property may be canceled by the purchaser within a specified period of time, such as 90 days, the order is a contract binding on the purchaser if the period of time had expired before April 19, 1969, or the right to cancel the contract had been terminated before that date * * * [H. Rept. 91–413 (1969), 1969–3 C.B. 200, 315; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 569–570.]

Petitioner can supply no reason why "cancel," when used in a carefully drawn committee report should have a colloquial meaning, while the same word should have a technical, legalistic meaning when used in an ordinary contract drawn by a layperson.

Finally, petitioner's interpretation of the word "cancel" in the contract makes the term redundant. Both U.C.C. section 2–711 (Mass. Ann. Laws ch 106, sec. 2–711 (1976)), and general principles of contract law entitle a party to cancel "for breach by the other" party. If "cancellation" was intended only as a remedy for failure to perform, or for a breach of contract, it would similarly have been unnecessary to specify that "cancellation" would involve no penalty to petitioner.

Petitioner's position that it could only cancel if C. & K. breached the contract by providing looms unadaptable to its needs also contradicts the admitted fact that C. & K. refused to guarantee the looms' adaptability. The failure of the looms to meet petitioner's needs would not have constituted a breach of the contract justifying cancellation under the U.C.C. because C. & K. never warranted that they would be adaptable.

Since we conclude that petitioner had the power to cancel the contract which did not expire before April 18, 1969, the 48 looms comprising the second and third segment of the contract are not pre-termination property under section 49(b) and do not qualify for the investment tax credit.

We are not without sympathy for petitioner's plight. It had made an economic commitment to proceed with the project prior to the termination of the investment credit. But Congress provided a variety of carefully defined exceptions to the investment credit termination, some of them related to prior economic commitments. (See sec. 49(b)(2), equipped building rule, 49(b)(3), plant facility rule, and 49(b)(4), machinery or equipment rule). The parties agree that these rules, dealing with practical economic commitments, are inapplicable herein.

Petitioner relies wholly on section 49(b)(1), the binding contract rule, and this requires not an empirical commitment, but a juridical commitment. The statute and legislative history make it crystal clear that Congress drafted the exception petitioner relies on to require a legally binding commitment. During the last decade and a half since the investment credit was first enacted,[8] it was suspended,[9] restored,[10] repealed,[11] reenacted,[12] and substantially broadened.[13]

Congress has consistently and carefully reviewed this economic incentive to capital formation, implementing its intent in very specific statutory language. This language is very clear, and fully supported by unambiguous legislative history. While we might sympathize with petitioner for having fallen between the cracks, that is precisely where Congress put it—and we will not emasculate the statute or find a binding contract where none exists in order to remove it to a safe harbor.

*Decision will be entered under Rule 155.*

---

[8] Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960.
[9] Act of Nov. 8, 1966, Pub. L. 89-800, 80 Stat. 1508.
[10] Act of June 13, 1967, Pub. L. 90-26, 81 Stat. 57.
[11] Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487.
[12] Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497.
[13] Tax Reduction Act of 1975, Pub. L. 94-12, 89 Stat. 26.
[1] Cases of the following petitioners are consolidated herewith: F. Hoyt Cunningham, Jr., and Helen Cunningham, docket No. 2755-74; and Mary C. Parker (formerly Mary Elva Cocker), docket No. 2756-74.