**SUNBURY TEXTILE MILLS, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 78–1031.

United States Court of Appeals, Third Circuit.

Argued Sept. 8, 1978.

Decided Oct. 31, 1978.

David Milne, IV, M. Duncan Grant, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Richard Henry Klein, Sunbury, Pa., for appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Richard W. Perkins, John G. Manning, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and STERN, District Judge.*

OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question presented in this appeal by the taxpayer, Sunbury Textile Mills, Inc., is whether the Tax Court properly interpreted a contract between Sunbury, a small textile producer in northern Pennsylvania, and Crompton & Knowles Corp. (C&K), a manufacturer of weaving machines.

In March 1969, Sunbury contracted to purchase 72 looms from C&K. Delivery was made in three segments over a period of several months. The Tax Court ruled that even though Sunbury purchased all of the looms as scheduled, it had, during the course of the contract, the unrestricted power to cancel the second and third segments and was therefore not subject to a binding contract for purposes of investment credits claimed by Sunbury on its 1970 and 1971 tax returns. We disagree with the Tax Court's interpretation of the contract and reverse.

---

* Honorable Herbert J. Stern, of the United States District Court for the District of New Jersey, sitting by designation.

## I.

We are called upon to decide which of two interpretations of the contract is proper, based on written documents, the extrinsic evidence received by the Tax Court to assist in interpreting the documents, the findings of fact which the court made, and the legal conclusions drawn therefrom. The conflict between the taxpayer and the Commissioner is not sophisticated. Sunbury contends that in March 1969 it entered into a binding contract to purchase 72 looms, subject only to the right to cancel a portion thereof for cause. The Commissioner contends that Sunbury was obligated to purchase only 24 of the looms and had an absolute right to cancel the remainder.

The question of whether the entire contract for 72 looms was binding on Sunbury in March of 1969 is vital because of the termination period created by § 49 of the Internal Revenue Code, 26 U.S.C. § 49,[1] which suspended the investment credits in effect for the taxable years in question. Section 38 of the Code allows an investment credit for all property defined as "section 38 property." 26 U.S.C. § 38. The definition of this term is set out in § 48 of the Code and need not be examined in detail, for the Commissioner readily concedes that all 72 looms will qualify as "section 38 property" if the requirements of § 49 are satisfied. For our purposes it is sufficient to say that § 49(a)(2) excludes from "section 38 property" any property acquired by the taxpayer after April 18, 1969, other than pre-termination property; and § 49(b)(1) provides that any property shall be treated as pre-termination property if it was acquired pursuant to a contract that was, on April 18, 1969, and at all times thereafter, binding on the taxpayer. 26 U.S.C. §§ 49(a) and (b).

Therefore, we must determine if such a contract existed between Sunbury and C&K for the 72 looms.

The foregoing provisions of the Internal Revenue Code concededly govern the contract before us. The investment credit incentives were only temporarily affected by the termination provisions of 26 U.S.C. § 49(a) and (b), for in 1971 Congress repealed these restrictions and restored the credit. 26 U.S.C. § 50. Thus, it was only for a discrete period of less than two years, from April 19, 1969 to March 31, 1971, that the taxpayer and like businesses were faced with the termination provisions.

The parties have stipulated, and the Tax Court agreed, that state law, in this case Massachusetts law, governs the interpretation of the contract, *Sartori v. Commissioner,* 66 T.C. 680, 689 (1976).

## II.

The Tax Court's findings may be summarized as follows. In 1967, Sunbury began to explore the market for a high-speed shuttleless loom capable of weaving its jacquard upholstery fabric. One of the firms contacted was C&K, which was in the business of building customized weaving machines. After examining a number of different shuttleless looms, Sunbury determined that C&K's Outside Filling Supply (OFS) loom was the best model available. By a unanimous vote of its board of directors, Sunbury decided to purchase 72 OFS looms at a contract price of $684,948.

Gordon G. Matheson, Sunbury's president, represented the mill during the negotiations with C&K for the purchase of the OFS looms. Henry C. Wingard was the domestic sales manager of C&K and personally nego-

---

1. § 49. *Termination for period beginning April 19, 1969, and ending during 1971*

(a) *General Rule.*—For purposes of this subpart, the term "section 38 property" does not include property—

(1) the physical construction, reconstruction, or erection of which is begun after April 18, 1969, or

(2) which is acquired by the taxpayer after April 18, 1969, other than pre-termination property. . . . .

(b) *Pre-termination property.*—For purposes of this subpart—

(1) *Binding contracts.*—Any property shall be treated as pre-termination property to the extent that such property is constructed, reconstructed, erected, or acquired pursuant to a contract which was, on April 18, 1969, and at all times thereafter, binding on the taxpayer.

. . . . .

tiated the sale. In addition, since C&K's service department was under his jurisdiction, Wingard had overall responsibility for starting up the looms and making them perform.

Testimony presented in the Tax Court showed that Wingard sent Matheson a letter dated February 27, 1969 entitled "Proposal for New OFS Looms." This letter provided:

We believe that the proposal we have now worked out does offer the best approach we can give in regard to being able to make continuous shipment and still at the same time allow for your people to make some evaluation of the first looms which are installed, before proceeding with the entire order, and our proposal is as follows:

1. If we can have your order for seventy-two new OFS looms by Friday, March 7, 1969, we would ship the first twelve looms in July in order to let your people get started with training and evaluation. (This would be before our shutdown for vacation.) The next twelve looms would then follow in September.

2. You would then let us know by October 15, 1969, whether you wished to cancel the balance of forty-eight looms, or have us proceed to build them for you. There would be no cancellation charge, provided we hear from you by September 15, 1969.

68 T.C. 528, 531. Other testimony was adduced relating to subsequent communications by Sunbury to its two mortgagees, Philadelphia Life Insurance Company and the First National Bank of Sunbury, concerning the proposed contract with C&K.

On March 25, 1969, C&K forwarded to Sunbury a document entitled "Specifications," which included seven typed pages prepared by Wingard. The specifications provided, *inter alia:*

Quantity 72   *Type Outside Filling*

*Supply Jacquard Looms*

.    .    .    .    .

## TERMS OF PAYMENT

Total order of seventy-two (72) looms to be divided into three (3) separate sections—each comprising twenty-four (24) looms. The first section to be shipped twelve (12) looms in July 1969, twelve (12) looms in September 1969. The second section to be shipped twelve (12) looms January 1970, twelve (12) looms February 1970. The third section to be shipped twelve (12) looms March 1970, twelve (12) looms April 1970.

Sunbury Mills to notify Crompton & Knowles by October 15, 1969 whether the balance of forty-eight (48) looms representing the second and third sections of the order will remain in force for the specified shipping schedule or if they are to be cancelled. No cancellation charge is involved with the last forty-eight (48) looms if notice of cancellation intent is received by Crompton & Knowles no later than October 15, 1969.

Following the seven pages of typewritten specifications were two pages of standardized printed forms. They contained boilerplate provisions written into most of C&K's contracts. Two provisions provided:

2. The Buyer shall not change or cancel or countermand any part of the order upon which this agreement is based or otherwise cause the work or shipment to be delayed, except with the written consent of and upon terms agreed to by the Seller.

.    .    .    .    .

12. This writing is intended by the parties as a final expression of their Agreement and is intended also as a complete and exclusive statement of the terms of their Agreement, and shall not be modified except by a writing signed by the parties. This Agreement shall be governed by the Uniform Commercial Code, as adopted in the State of Massachusetts and as effective and in force on the date of this Agreement. Any action for breach of this Agreement must be commenced within one (1) year after the cause of action has accrued.

On March 28, 1969, Sunbury returned the signed formal specifications to C&K together with a covering letter and purchase order. The covering letter stated, "Enclosed is the signed order with the formal specifications for the 72 OFS jacquard looms." The purchase order read, in part:

Total order of seventy-two (72) looms to be divided into three (3) separate sections—each comprising twenty-four (24) looms.

.     .     .     .     .

Sunbury Textile Mills will notify Crompton & Knowles by October 15, 1969 whether the balance of forty-eight (48) looms representing the second and third sections of the order will remain in force or to be canceled. No cancellation charge to be made if cancellation is made prior to October 15, 1969.

From the testimony presented, the Tax Court found:

It was not until some months after the contract was signed and the initial 24 looms were delivered that petitioner was convinced the looms would perform properly. By mutual agreement, the period during which petitioner was entitled to cancel as to the latter 48 looms was extended so that the final commitment was not given by petitioner and acknowledged by [C&K] until some time in December 1969.

The second group of 24 looms was received by petitioner in March and April of 1970 while the third group of 24 looms was received in May and June of 1970. These contained somewhat different specifications from each other and from the original 24 looms. However, it was normal in the textile industry to perfect the looms on the mill floor, and it was clear from the beginning that minor modifications would be made as they discovered what would be necessary to properly adapt the looms. [C&K] waited until notified by petitioner that the remaining 48 looms would not be canceled to purchase components needed in meeting petitioner's specific requirements, but ordered other components which could have been used in filling other orders if petitioner exercised its cancellation privilege.

68 T.C. at 536–37.

The Tax Court determined that the document prepared by C&K entitled "Specifications," accepted by Sunbury on March 28, 1969 and returned by Sunbury with its purchase order, constituted a binding agreement between the parties. However, the court construed the agreement as giving Sunbury an *option* to purchase 48 of the looms and binding Sunbury only as to 24. Accordingly, it disallowed the investment credit covering the last 48 looms.

### III.

This litigation centers on the meaning of the words "cancelled" and "cancellation." Sunbury's witnesses testified that these words meant termination for cause; the Commissioner argued that the language gave Sunbury the right to terminate any contractual obligation at will.

It was the Commissioner's position at trial, reasserted on appeal, that no extrinsic evidence may be considered in interpreting these words. The Tax Court held that Massachusetts law, specifically § 2–202 of the Uniform Commercial Code,[2] allows parol or extrinsic evidence under certain circumstances, but the Tax Court's opinion is totally bereft of any discussion of the law of contracts. Because it is first necessary to

---

**2.** Mass.Gen.Laws, Ann. ch. 106, § 2–202, Final Written Expression: Parol or Extrinsic Evidence

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (section 1–205) or by course of performance (section 2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

apply the law of contract interpretation before considering rules that exclude evidence,[3] it is to that threshold question we now turn.

## A.

Before we consider the provisions of U.C.C. § 2–202, it is necessary to determine the meaning of the written instrument. Professor Corbin puts it succinctly: "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation it is determined what the writing means. The 'parol evidence rule' is not, and does not purport to be, a rule of interpretation or a rule as to the admission of evidence for the purpose of interpretation. Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by [extrinsic evidence]." 3 A. Corbin, *Corbin on Contracts* § 579 at 412–13 (1960).[4]

■ Thus, where the parties have not defined with precision the terms of a written instrument, notwithstanding a written statement that the instrument purports to be, as here, a complete and exclusive statement of the terms of their agreement, there is no legal precept that prohibits the reception of evidence to determine the intent of the parties. *Id.* § 579.

■ By brief and at oral argument, the parties to this litigation—one of whom, it bears mention, is not a party to the contract—emphasized the obvious ambiguity of the words "cancelled" and "cancellation." The Commissioner insists that the words be given their dictionary meaning; the taxpayer urges that they be given the meaning agreed to by the parties, or alternatively, the statutory definition contained in U.C.C. § 2–106.[5] Under these circumstances it was not improper for the trial court to admit evidence to resolve this ambiguity, that is, to explain the meaning of the words.[6] We believe that this case is governed *a fortiori* by the general rule: "The court will give legal effect to the words of a contract in accordance with the meaning actually given to them by one of the parties, if the other knew or had reason to know that he did so. In determining the meaning so given by the one and the fact of knowledge or reason to know by the other, the court will hear all relevant evidence of the surrounding circumstances, including the admissions of the parties, the negotiations and antecedent communications between them, and all current usages that might have affected their choice of the words." Corbin, § 543 at 140.

## B.

The Supreme Judicial Court of Massachusetts, speaking through Justice Robert

---

**3.** Professor Corbin states the parol evidence rule as follows: "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." 3 A. Corbin, *Corbin on Contracts* § 573 at 357 (1960).

**4.** Corbin emphasizes that the parol evidence rule purports to exclude testimony only when it is offered for the purpose of "varying or contradicting" the terms of an "integrated" contract; it does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to those terms. *Id.,* § 543 at 130.

**5.** Section 2–106(4):

"Cancellation" occurs when either party puts an end to the contract for breach by the other

and its effect is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

**6.** It is true that the language of some agreements has been believed to be so plain and clear that the court needs no assistance in interpreting. Even in these cases, however, it will be found that the court has had the aid of parol evidence of the surrounding circumstances. The meaning to be discovered and applied is that which each party had reason to know would be given to the words by the other party. Antecedent and surrounding factors that throw light upon this question may be proved by any kind of relevant evidence.

Corbin, § 579 at 414–20 (footnotes omitted).

Braucher,[7] has recently summarized the relevant legal precepts:

[T]here was no error in the admission of evidence of the facts and circumstances of the transaction, including the situation and relations of the parties, for the purpose of applying the terms of the written contract to the subject matter and removing and explaining any uncertainty or ambiguity which arose from such application. *Stoops v. Smith,* 100 Mass. 63, 66. A lease is to be read in the light of the circumstances of its execution, which may enable the court to see that its words are really ambiguous. *Sheff v. Candy Box Inc.,* 274 Mass. 402, 406, 174 N.E. 466. When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms. *Smith v. Vose & Sons Piano Co.,* 194 Mass. 193, 200, 80 N.E. 527. *Goldenberg v. Taglino,* 218 Mass. 357, 359, 105 N.E. 883. See Restatement 2d: Contracts (Tent. draft No. 5, March 31, 1970), §§ 235, 236 (Tent. draft No. 6, March 31, 1971), §§ 240, 241. Compare Uniform Commercial Code, G.L. c. 106, § 2–202, inserted by St.1957, c. 765, § 1. Expressions in our cases to the effect that evidence of circumstances can be admitted only after an ambiguity has been found on the face of the written instrument have reference to evidence offered to contradict the written terms. See *Violette v. Rice,* 173 Mass. 82, 84, 53 N.E. 144; *Snider v. Deban,* 249 Mass. 59, 61, 144 N.E. 69.

*Robert Industries, Inc. v. Spence,* 362 Mass. 751, 753–54, 291 N.E.2d 407, (1973).[8]

■ Here, both parties to the contract—Sunbury and C&K—agree as to the meaning actually given by them to the words "cancelled" and "cancellation" in the contract: to wit, that Sunbury had a binding contract for the purchase of 72 looms subject to the right to cancel the last 48 if the first 24 proved to be ill-suited to Sunbury's needs. The evidence introduced by Sunbury at trial was not designed to contradict or change the written terms, but to explain their meaning. Where, as here, there is no dispute between the contracting parties over the meaning of the terms, extrinsic evidence should not be considered in light of the parol evidence rule as contradicting the integrated agreement, but as providing an explanation of the parties' contractual understanding. Their harmonious recital of what these words mean is conclusive. *See* Corbin, *The Interpretation of Words and the Parol Evidence Rule,* 50 Cornell L.Rev. 161 (1965). Under these circumstances it is not necessary to consider the exclusionary aspects of the parol evidence rule and U.C.C. § 2–202.

### IV.

■ Massachusetts law emphasizes that the interpretation of an integrated agreement is a matter of law on which an appellate court is not bound by the trial judge's conclusions unless the problem of interpretation is affected by findings of fact. *Robert Industries, Inc. v. Spence, supra,* at 755, 291 N.E.2d at 407. *See also Restatement (Second) of Contracts* § 238 (Tent. Draft No. 5, 1970). It thus becomes necessary to review the evidence presented to the Tax Court, subject to the exclusions explicitly determined by the court as fact finder. We start this analysis with an examination of that portion of the oral testimony rejected by the fact finder. The court expressly refused to credit, in a slightly varying degree, testimony in two relevant areas: Sunbury's explanation to its financial backers, and similar language in other documents:

Petitioner elicited considerable testimony attempting to explain what Sunbury meant when it advised its financial backers that it was not going beyond 24 looms "because of the possibility of a faster loom being developed for upholstery

---

7. Prior to his appointment to the court, Justice Braucher was Reporter to The American Law Institute for the Restatement, Second, of Contracts.

8. As indicated by Justice Braucher's citation of the 1899 case of *Violette v. Rice,* Massachusetts has had a long and consistent experience with the parol evidence rule.

weaving." In the end the testimony was, to put it generously, quite unconvincing. Nor was the testimony on similar language in the other documents sufficiently compelling to give the language an awkward and unusual construction.

68 T.C. at 541.

In interpreting the integrated agreement, we must therefore reject that testimony relating to views or opinions in other documents or matters communicated to the Philadelphia Life Insurance Company and the First National Bank of Sunbury. We will not, however, reject the testimony of either Matheson or Wingard about other circumstances relating to the meaning of the terms of the writing because the court as fact finder did not reject it. Indeed, the court relied on this testimony in fashioning its lengthy findings of fact, 68 T.C. at 529–31. While discussing the Commissioner's objection to this testimony as impermissible under the parol evidence rule, the Tax Court noted:

> Respondent also invokes the parol evidence rule, but since we do not find the evidence objected to helpful to petitioner's cause, the facts do not require an extended analysis of the parameters of the parol evidence rule.

68 T.C. at 539 n. 6.

Thus, for the purpose of evaluating this evidence on review, we note that the Tax Court did not challenge the credibility of the witnesses, but only the "helpfulness," i. e., the relevance, of the testimony to Sunbury's case. Since we have determined that this evidence was both admissible and relevant under Massachusetts law, we must examine the testimony of Matheson and Wingard concerning the intent of the contracting parties as to the meaning of the terms "cancelled" and "cancellation."

#### A.

In the myriad cases of contract interpretation which fill the state and federal reports, there is invariably a dispute between the parties over intention. But this is not a typical case. The *parties* to the contract agree as to their intention. It is the Commissioner of Internal Revenue, a *non-party*, who challenges the parties' interpretation of their own contract. Obviously, the Commissioner must man the laboring oar in any effort to contradict the stated intent of the parties. In the Tax Court trial, he did not. The following testimony of Matheson is uncontradicted:

> [T]his was an order for 72 looms. And I understood that if the first 24 were okay, and did our job, the others would follow just as quick as they could, because we needed 72 right then. But I also understood that if the first 24 did not work there was a definite cancellation without charge, or whatever, for cause, that would take place in the second two groups of 24, and at that point Wingard and I would have been going on what to do with the first 24, which we had in there, because under any reputable manufacturer, if the loom will not work or the machinery will not work, we can sue to correct the cause or get them to take them back. There was nothing specified in the contract about what had to be a satisfactory loom condition, and I really defy any machine manufacturer to write those things properly, because every textile mill is different. No two textile mills weave the same fabric.

Appendix at 68a.

Matheson also testified that there had never been a similar installation in any other jacquard upholstery mill, that C&K could not guarantee the looms, and that if the first 24 did not work properly in the Sunbury Mill then the last 48 looms were to be automatically cancelled. *Id.* at 70a.

This testimony was not shaken on cross-examination, nor countered by any contrary evidence. Rather, it was completely corroborated by Matheson's counterpart at C&K, Wingard, the scrivener of the contract:

> Mr. Milne: Would you please, tell Your Court what you meant when you prepared that contract? What your understanding of your agreement with Mr. Matheson was?
>
> A. Mr. Matheson and I had had many conversations about the OFS loom. And I did write this paragraph myself. My understanding was that Crompton &

Knowles, and Sunbury, had a firm contract for 72 OFS looms. We would ship the first 24 looms on the schedule as outlined in the specifications, . . . and we were to ship the balance of the 24 in September. And Sunbury would be in the process of evaluating those looms and notify us by October, the middle of October, as to whether we were to proceed with the balance of the looms, based on the performance of the first 24 looms which were shipped.

. . . . .

Q. Do you know the difference between an option and a contract for the purchase, binding contract on both sides for the purchase and sale of looms?

A. Yes, sir.

. . . . .

Q. Did you intend this contract to give Sunbury Textile an option—

A. No, sir.

Q. —to buy 48 looms if they wanted to?

A. No, sir.

Q. This was a binding purchase order for 72 looms?

A. Yes, sir.

Appendix at 145a–146a.

### B.

■ The Tax Court admitted all of this testimony over the objection of the Commissioner. Although the Commissioner has not taken a cross appeal from the Tax Court, he now argues that the testimony is inadmissible under Massachusetts law because U.C.C. § 2–202 limits the reception of parol or extrinsic evidence and allows only two exceptions—the introduction of course of dealing or usage of trade, U.C.C. § 1–105, and course of performance, U.C.C. § 2–208. This argument need not detain us because of our previous discussion in Section III, *supra.* In any event, however, the uncontradicted testimony of Wingard regarding

the general lack of options in contracts for the sale of weaving looms clearly qualifies under § 1–205(2).[9]

### V.

Notwithstanding the formidable testimony concerning intention of the parties, the trial ruling which permitted this testimony, and the applicable Massachusetts contract law, the Tax Court failed to perceive the relevance of this critical evidence. The court did not reject this evidence but totally ignored it as irrelevant, and decided the case by resolving a peripheral controversy between the parties as to whether the U.C.C. or the dictionary definition of "cancellation" should prevail. In doing so, the court passed over the main thrust of Sunbury's case and discussed only its alternative argument that the definition of cancellation should be governed by U.C.C. § 2–106, which provides that "cancellation" is defined as an ending of the contract for cause.[10] The court determined that it "is not the intent of U.C.C. § 2–106 to define words as they are used in every day contracts . . . .. Since Wingard, the author of the passage in question, was not trained in the law, it is much more reasonable in gleaning the intent of the parties, to give the term its ordinary meaning rather than the specialized connotations of the U.C.C." 68 T.C. at 542. The court then relied on the dictionary definition of "cancel" and decided the case.

■ We need not resolve this particular semantic controversy. Rather, we resort to the Massachusetts law we have previously cited and decide this case on the basis of the documents and other evidence adduced at trial. The Tax Court sloughed off vital oral evidence of the precise intent of the parties: "[W]e do not find the evidence . . . helpful to petitioner's cause." 68 T.C. at 539. In so doing, the court credited this evidence but failed to recognize its relevance under Massachusetts

---

9. Section 1–205(2) provides:

   (2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

10. *See* note 5, *supra.*

law. It therefore committed reversible error. Since this was a failure to apply the correct legal precepts to uncontroverted evidence disclosing the actual intent of the parties to the contract, and since under Massachusetts law, "[t]he interpretation of an integrated agreement is a matter of law on which [the appellate court] is not bound by the trial judge's conclusion unless the problem of interpretation is affected by findings of fact," *Robert Industries, Inc. v. Spence, supra,* 362 Mass. at 755, 291 N.E.2d at 407, we hold that Sunbury is entitled to the tax credit because its evidence, especially the uncontradicted testimony of the author of the ambiguous language, was sufficient to prove the intention of the parties—that Sunbury contracted to purchase all 72 looms subject to its right to cancel the last 48 if, but only if, the first 24 proved to be unsatisfactory.

The decision of the Tax Court will be reversed and the proceedings remanded for the entry of a decision consistent with the foregoing.